**UNITED STATES of America, Appellee,**

**v.**

**Barbara RODRIGUEZ, Appellant.**

**No. 361, Docket 82–1188.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 3, 1982.

Decided April 13, 1983.

Richard A. Reeve, Asst. Federal Public Defender, D. Conn., New Haven, Conn. (Thomas G. Dennis, Federal Public Defender, D. Conn., New Haven, Conn., of counsel), for appellant.

William C. Bryson, Atty., U.S. Dept. of Justice, Washington, D.C. (Alan H. Nevas, U.S. Atty., D. Conn., New Haven, Conn., of counsel), for appellee.

Before TIMBERS, KEARSE and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

Barbara Rodriguez appeals from a judgment of conviction entered May 14, 1982, in the United States District Court for the District of Connecticut, after a jury trial before Judge Daly. Appellant was found guilty of aiding and abetting the making of a false statement on a passport application in violation of 18 U.S.C. §§ 1542 and 2 (1976). The principal issues on appeal are: 1) whether there was a sufficient basis for permitting a key defense witness to assert the Fifth Amendment privilege, and 2) whether the district court erred in not receiving evidence under Fed.R.Evid. 804(b)(3) or (b)(5). We conclude that the district court's rulings on these issues were not erroneous, and, further, that the evidence was sufficient to support a conviction. Therefore, we affirm.

## I.

The record discloses that an investigation of an alleged house of prostitution at 89 Ellsworth Street, Bridgeport, Connecticut, run by appellant's co-defendant Melody Law, was being conducted by the Federal Bureau of Investigation (FBI). Appellant was employed there as a prostitute from February through July of 1981. On July 13, 1981, special agents of the FBI conducted a raid of the house, searched Law's car and various safe deposit boxes, and seized a passport in the name of Melody Arlene Law and a birth certificate in the name of Melody Arlene French. The search also revealed that Law had under her control various birth certificates, drivers licenses and other personal papers of other women who allegedly worked as prostitutes for her. This search did not disclose any documents relating to the appellant. In late October, 1981, Law was informed that she was the target of an FBI investigation involving her prostitution activities.[1]

A few days later on November 8, 1981, the Office of Vital Records for the Commonwealth of Pennsylvania received a handwritten letter requesting a duplicate birth certificate of Barbara Rose Lutzick—the maiden name of appellant—and enclosing three dollars in cash. This application was returned because the fee was four dollars; the envelope from the Office of Vital Records was seized by law enforcement officers from the mailbox at 89 Ellsworth Street on November 18, 1981.

On November 15, 1981, FBI Special Agent Raymond Palmowski saw an advertisement in the Fairfield Citizen News of a "tag sale" being held at 89 Ellsworth Street; he called the telephone number listed in the ad and made an appointment to attend. When he appeared, he observed Melody Law and appellant; Law told him that she was selling her property because she was moving to California.

On November 17, 1981, FBI Special Agent Andrew Aquillini observed Law in the Connecticut Department of Motor Vehicles in Hamden, Connecticut. She applied for a license, had her photograph taken, and

---

1. Melody Law was indicted by a federal grand jury on September 9, 1982; she was charged in nine counts with violations of 18 U.S.C. §§ 1952, 2422 (1976) and 26 U.S.C. § 7201 (1976), involving interstate prostitution and income tax evasion. Law pleaded guilty on November 30, 1982 to two counts of the indictment, and was sentenced to a four year term of imprisonment and a $20,000 committed fine. She is presently incarcerated.

obtained a Connecticut driver's license in the name of "Barbara Lutzick."

On November 18, 1981, Law and appellant visited the passport office in Stamford, Connecticut. The FBI had installed videotape equipment at the passport office, and a tape of the two women's visit to that office was shown at trial to the jury. FBI Special Agent John Connaughton was also at the passport office when the women arrived. He overheard Law apply for a passport, using appellant's maiden name, "Barbara Rose Lutzick." Together with the application, Law submitted the driver's license which she had obtained in appellant's name, a copy of appellant's birth certificate, and two photographs of herself which she signed using appellant's maiden name. The videotape and the testimony of Daniel Pappas, a passport examiner, showed that appellant was standing next to Law as Law submitted the application and supporting documentation at the passport office window.

The passport application bore appellant's date and place of birth, the names and dates of birth of appellant's parents,[2] but it bore Law's home address, physical description, and photo. After reviewing the application, Pappas asked whether Law wished the passport to be in the name of "Barbara R." or "Barbara Rose," to which Law responded "Barbara Rose." Law signed the application and swore that its contents were accurate. During the course of this transaction, appellant said "I guess nodding your head isn't good enough," and asked whether the passport could be picked up that same day. After Law informed Pappas that she was in urgent need of the passport, he agreed to process the application quickly so that the passport would be ready that afternoon. Pappas then gave Law a receipt that would enable her to pick up the passport the same day.

Law was arrested later that day upon returning to her residence with appellant, and was charged with making a false statement on a passport application in violation of 18 U.S.C. §§ 1542 and 2. In the presence of FBI agents, appellant told Law that Law had appellant's purse, and asked that it be returned to her. When Law handed the purse to appellant, one of the agents took it. Soon thereafter, Law voluntarily handed a cigarette case to appellant. The agents also took this item.

A subsequent search of the purse revealed the receipt from the passport office and a Connecticut driver's license in the name of "Melody Law." A search of the cigarette case revealed a birth certificate in the name of "Barbara Rose Lutzick" and a driver's license also in that name but with a picture of Melody Law.

An indictment was filed on November 24, 1981, charging appellant in two counts. Count One charged her with aiding and abetting another in making a false statement in a passport application, in violation of 18 U.S.C. §§ 1542 and 2. Count Two charged her with being an accessory after the fact to the same offense, in violation of 18 U.S.C. § 3 (1976). In a bill of particulars subsequently filed by the government, it was stated that "the furnishing of documents and information to Ms. Law by Ms. Rodriguez which enabled Ms. Law to apply for a passport in Ms. Rodriguez's name" was the conduct which constituted aiding and abetting as charged in Count One.

Melody Law was named as a co-defendant in Count One, as the party who actually made the false statements in the passport application. She entered a guilty plea under the doctrine of *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970),[3] on January 4, 1982 and was sentenced on February 3, 1982 to a term of one year of imprisonment.

**2.** The date of birth of appellant's father was incorrect by about one month.

**3.** In *Alford,* the defendant took the stand and testified that he had not committed the murder of which he had been accused but pleaded guilty to a lesser crime in order to avoid the death penalty. The Supreme Court held that the trial judge had not committed constitutional error in accepting Alford's plea "[i]n view of the strong factual basis for the plea demonstrated by the state and Alford's clearly expressed desire to enter it despite his professed belief in his innocence." 400 U.S. at 38, 91 S.Ct. at 167.

During appellant's trial a fingerprint expert employed by the FBI, and testifying for the government, stated that he found Law's fingerprints on the passport application and on the letter to the Pennsylvania Division of Vital Statistics seeking a duplicate birth certificate of Barbara Rose Lutzick. He testified that he also found appellant's fingerprints on the birth certificate and the letter. At the conclusion of the government's case, defendant moved for judgment of acquittal on both counts. Her argument with respect to Count One was that the government had charged that the act upon which her criminal liability hinged was furnishing documents and information to Law, and that there was no evidence by which a reasonable juror could find beyond a reasonable doubt how, when, and under what circumstances Law received the birth certificate and information from appellant. The court reserved decision on the motion with respect to both counts.

Appellant testified in her own defense that she was employed by Melody Law as a prostitute from February, 1981 through July, 1981. She stated that when she began working for Law, she gave Law many of her personal papers, including her birth certificate for safe-keeping, because appellant's residence was in an unsafe area. She testified that in November, 1981, believing that she needed a birth certificate to obtain a Connecticut driver's license, she asked Melody Law to order a new birth certificate for her, because she thought the old one had been confiscated during the FBI raid in July, 1981. She gave Law information about her mother and father, and looked at the letter Law had written before it was mailed.

Appellant admitted that she was present at the tag sale about which FBI Agent Palmowski testified. She testified that although she had accompanied Law to the passport office on November 18, 1981, she did not know Law's intentions until the passport agent mentioned the name "Barbara Rose." She admitted that she had asked the passport agent whether it would be possible to pick up the passport that same day, that Law later confirmed to her that she had falsely applied for a passport in appellant's name, but she denied having supplied Law with the necessary documents and information so that Law could apply for the passport. She further testified that she had taken the purse and cigarette case from Law so that she could safeguard them and stated that she had no intention of concealing the documents that were subsequently found inside them.

As a part of the defense's case and prior to appellant taking the stand, Melody Law was called as a witness, whereupon her attorney indicated that she intended to assert her Fifth Amendment privilege against self-incrimination. The court noted that Law had entered a guilty plea pursuant to the *Alford* doctrine and that the claimed basis for assertion of the privilege was that she was the target of a pending grand jury investigation. The trial judge briefly questioned Law to determine whether she intended to follow her lawyer's advice not to testify and concluded that he "was not going to override the advice of [her] counsel." The court then denied defense counsel's requests that Law be directed to answer questions propounded by the defense, and that the court find that Law did not have a legitimate Fifth Amendment right to decline to testify. The court also denied defense counsel's motion for a mistrial and for a grant of immunity for Melody Law.

In addition, the court denied defendant's request that a defense investigator, Robert Porter, be permitted to testify as to interviews he had had with Law about her role in the events herein, pursuant to Fed.R. Evid. 804(b)(3) or (b)(5). The court held that the statements which Law made to Porter during these interviews were neither against her penal interest when made with respect to Count One of the subject indictment since she had already pleaded guilty, nor with respect to ongoing grand jury investigations, because potential charges resulting therefrom were too speculative to form the basis of penal interest for purposes of the rule.

## II.

### A. Fifth Amendment Privilege

Appellant contends that the district court allowed Melody Law to make a blanket assertion of a Fifth Amendment privilege without any particularized inquiry into the basis of that claim and that this was error. Thus, appellant argues that (1) Law did not have a legitimate Fifth Amendment privilege which excused her from all testimony; and (2) the district court should have made a particularized inquiry into the underlying basis for the assertion of the privilege.

### 1. Validity of Fifth Amendment Privilege Claim

■ The Fifth Amendment to the United States Constitution states in part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The privilege thus created is grounded on a reasonable fear of danger of prosecution. *Hoffman v. United States,* 341 U.S. 479, 485–86, 71 S.Ct. 814, 817–18, 95 L.Ed. 1118 (1951); *Rogers v. United States,* 340 U.S. 367, 372–73, 71 S.Ct. 438, 441–42, 95 L.Ed. 344 (1951). The Supreme Court clarified the meaning of this privilege in *Hoffman,* stating "[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." 341 U.S. at 486–87, 71 S.Ct. at 818. Moreover, the *Hoffman* court observed that the privilege extends not only to disclosures which would in themselves support a conviction, but also to those which would "furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Id.* at 486, 71 S.Ct. at 818.

■ Courts have recognized that claims of privilege under the Fifth Amendment should be carefully scrutinized since allowing a witness not to testify compromises the Sixth Amendment right of an accused "to have compulsory process for obtaining witnesses in his favor." *Washington v. Texas,* 388 U.S. 14, 17, 87 S.Ct. 1920, 1922, 18 L.Ed.2d 1019 (1967). As the Supreme Court noted in *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973), "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." A valid Fifth Amendment claim does, however, provide a justification for compromising an accused's Sixth Amendment rights. *United States v. Goodwin,* 625 F.2d 693, 700 (5th Cir.1980); *United States v. Melchor Moreno,* 536 F.2d 1042, 1046 (5th Cir.1976).

■ An otherwise valid Fifth Amendment privilege may be lost by a conviction, *Reina v. United States,* 364 U.S. 507, 513, 81 S.Ct. 260, 264, 5 L.Ed.2d 249 (1960); *United States v. Romero,* 249 F.2d 371, 375 (2d Cir.1957), or waived by a guilty plea, *Boykin v. Alabama,* 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969); *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 1170, 22 L.Ed.2d 418 (1969); *United States v. Sanchez,* 459 F.2d 100, 103 (2d Cir.), *cert. denied,* 409 U.S. 864, 93 S.Ct. 156, 34 L.Ed.2d 112 (1972). However, the scope of such loss or waiver must be carefully limited. As the Third Circuit noted in *United States v. Yurasovich,* 580 F.2d 1212, 1218 (3rd Cir.1978), the better-reasoned decisions construe the scope of the waiver resulting from a guilty plea as limited

> solely with respect to the crime to which the guilty plea pertains. If such crime is the only one for which the defendant is potentially liable, he can be forced to testify. But if the witness is still subject to prosecution for other crimes which his testimony might tend to reveal, the privilege remains.

*See also United States v. Pierce,* 561 F.2d 735, 738 (9th Cir.1977), *cert. denied,* 435 U.S. 923, 98 S.Ct. 1486, 55 L.Ed.2d 516 (1978); *United States v. Wilcox,* 450 F.2d 1131, 1142 n. 12 (5th Cir.1971), *cert. denied,* 405 U.S. 917, 92 S.Ct. 941, 30 L.Ed.2d 787 (1972). Thus, the Fifth Amendment privilege is not lost after a witness has pleaded guilty if the witness is still subject to a realistic risk of

incrimination on other charges, or if the desired testimony about the transaction in question would give rise to a risk of incrimination in connection with other transactions. *See United States v. Domenechi,* 476 F.2d 1229, 1231 (2d Cir.), *cert. denied,* 414 U.S. 840, 94 S.Ct. 95, 38 L.Ed.2d 76 (1973); *United States v. Miranti,* 253 F.2d 135, 138 (2d Cir.1958); *Romero,* 249 F.2d at 375.

■ Here, appellant argues that since Law had already entered a guilty plea pursuant to the *Alford* doctrine with regard to the charge against her in this indictment, her claim of privilege under the Fifth Amendment was no longer validly asserted. Appellee argues that the grand jury investigation which was pending with regard to her prostitution activities, and regarding which Law was informed she was a target in October, 1981,[4] was a sufficient basis upon which to invoke the Fifth Amendment privilege claim.

Law did indeed plead guilty to Count One of the instant indictment pursuant to the *Alford* doctrine. In the absence of the pending grand jury investigation of Law's activities and other potential related criminal charges, her guilty plea might well have eliminated her ability to validly assert the Fifth Amendment privilege. However, her likely testimony with respect to the transactions herein would necessarily have exposed her to examination, on cross if not direct, relating to her purpose in seeking to obtain a passport in another person's name, which in turn would likely have led to inquiry regarding her entrepeneurial role in prostitution activities, e.g., Mann Act violations, conspiracy, income tax law violations, etc. The information known to Judge Daly at the time of his ruling strongly suggested that Law intended to leave the country using a passport with a false name soon after she learned from federal authorities

that she was the target of a federal investigation.[5] Therefore, it was not at all unreasonable to assume that Law perceived herself to be, and indeed was, still at risk in terms of facing a raft of both federal and state charges. In light of these facts and circumstances, and particularly Law's and the court's knowledge of the pending grand jury investigation, we conclude that there was clearly a sufficient basis to give rise to a legitimate claim of privilege by Melody Law under the Fifth Amendment.

### 2. *Law's Assertion of the Privilege*

■ A district court should not accept a witness' blanket assertion of the Fifth Amendment privilege in response to any and all questions asked of her. Rather, once a witness has claimed the privilege, the district court must determine whether that claim is valid in relation to the subject area about which inquiry is sought. *Hoffman,* 341 U.S. at 486, 71 S.Ct. at 818. The *Hoffman* Court noted, however, that a district court should not require the witness to prove her claim in a strict sense, as this would cause her "to surrender the very protection which the privilege is designed to guarantee.... The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'" *Id.* at 486–87, 71 S.Ct. at 818. As to each inquiry, the court must determine "whether the witness is confronted with substantial and 'real,' and not merely trifling or imaginary hazards of incrimination." *Melchor Moreno,* 536 F.2d at 1049.

Here, when Law was called as a witness by appellant, her attorney immediately indicated that she would assert the Fifth Amendment privilege. The court inquired as to the general basis for the assertion, to which Law's counsel replied that there was

---

4. FBI Special Agent Connaughton testified that Law and her attorney were informed that Law "was the target of an FBI investigation and that several charges would be forthcoming against her and she would be indicted for viola-

tions of federal law which arose from her prostitution business in Bridgeport." (Tr. 17).

5. This, in and of itself, would likely have been a violation of 18 U.S.C. § 1073 (1976), which

a pending grand jury investigation of Law's activities.[6] The court then asked Law whether she understood that the matter as to which appellant was then being tried related to the charge to which she had earlier pleaded guilty pursuant to the *Alford* doctrine. Law responded that she did. The court then asked appellant's counsel whether his intended questions related to that matter, to which counsel replied in the affirmative. Appellant's counsel then asked the court to direct Law to answer counsel's questions. The court asked Law several questions as to whether she intended to follow her counsel's advice to plead

the Fifth Amendment, to which she replied that she did. The district judge concluded that he would not "override the advice of counsel" and stated further, "I have in mind the fact—the reasons stated on the record back here, I think it was January, when the plea was entered under the Alford doctrine, and that was a plea to Count 1 of this same indictment." [7]

Appellant's counsel then moved for a mistrial on the ground that Law was a critical witness, and moved for an order directing that the government grant Law immunity. Both motions were denied.[8]

makes it unlawful to flee from a judicial district to avoid prosecution or giving testimony.

6. MR. GANIM: Your Honor, for the record, my name is Raymond Ganim and I represent Melody Law.

THE COURT: And your name for the record is Melody Law? You have to answer so the reporter—

THE WITNESS: Oh. Yes.

MR. GANIM: And I would at this time assert the privilege on behalf of my client.

THE COURT: And the basis of the assertion, in a general kind of way, is?

MR. GANIM: That there is pending an investigation, grand jury investigation in New Haven which is presently in session, to the best of my knowledge, and it has been represented to both Miss Law and myself that she is a target of the investigation, and, if I'm not mistaken, that was stated in open court in your courtroom at the time that Miss Law and I appeared before this Court with respect to a matter that she was involved in.

THE COURT: It was not stated unequivocally, it was implied, certainly, to my recollection. It may have been unequivocal, I am under the impression, based on Miss Law's appearance here, where you represented her, and I think Mr. Gregorie appeared for the Government, I could be mistaken, she was then, and, for all I know, I don't know anything to the contrary, is now a target of a grand jury which is sitting in New Haven.

MR. GANIM: I have been so informed that she is a target of the investigation, and the source of the information, of course, is Mr. Gregorie. Richard Gregorie.

7. In an offer of proof at Law's guilty plea proceeding, the government stated that it would introduce the following evidence if Law were brought to trial:

1. FBI Agent Connaughton would testify that he was present at a meeting with Law and her attorney at which he informed Law that she was the target of an ongoing grand jury investigation.

2. A clerk of the United States Passport Office in Stamford, Connecticut would testify that Law came in and requested a passport application; she presented two documents including a Connecticut driver's license in the name of "Barbara R. Lutzick" but bearing a picture of Melody Law; that she filled out the passport application on July 13, 1981 using the name "Barbara Rose Lutzick" knowing that her name was in fact Melody Law. This testimony would be corroborated by that of an undercover FBI agent who was present at the passport office when these events occurred.

3. The following documents would be introduced: a birth certificate in the name of "Barbara Rose Lutzick," which was seized from Melody Law at the time of her arrest; a birth certificate in the name of "Melody Arlene French," which was seized from Melody Law at a search of her apartment on July 13, 1981; a notice from the passport office that the passport in the name of "Barbara Rose Lutzick" would be available to be picked up at 3 P.M. on November 18, 1981, which was seized at the time of Melody Law's arrest on November 18, 1981; the false passport application which was sworn to by Melody Law in the name of "Barbara Rose Lutzick;" and a videotape which was made at the passport office showing Melody Law swearing to the passport application.

Melody Law stated that she had no substantial dispute that this evidence would be offered. The court concluded at that hearing that "the record contains strong evidence of actual guilt in this case, I'm convinced that there's a strong factual basis for the government's case." (Tr. 150).

8. Appellant's counsel also moved to have Agent Porter testify regarding an interview with Law pursuant to Rule 804(b)(3), and made an offer of proof. See text *infra* at 39–41.

█ Thus, the record reflects that at the time Judge Daly made his ruling, he knew of the pending grand jury investigation; that the matter on trial and the questions appellant's counsel would ask involved the charge to which Law had entered an *Alford* guilty plea (Judge Daly had presided over the hearing at which that plea was entered); and that Law's attorney had discussed with her the ramifications of testifying at appellant's trial. Moreover, at Law's plea proceeding, Judge Daly had heard the government's offer of proof which gave a rather clear indication of Law's substantial involvement in the matters at issue. Given the extent of his knowledge, we hold that Judge Daly had sufficient information to make a reasoned judgment that if Melody Law were not permitted to assert her Fifth Amendment privilege, she would be "confronted with substantial and 'real,' and not merely trifling or imaginary hazards of incrimination." *Melchor Moreno,* 536 F.2d at 1049.

█ We note that in *United States v. Zappola,* 646 F.2d 48 (2d Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 145, 74 L.Ed.2d 122 (1982), Judge Werker,[9] writing for the panel, addressed the procedures which should be followed by a district court when a witness asserts the Fifth Amendment privilege. There, one Marano, a government informant, after a hearing, succeeded in quashing a government subpoena to have him testify at trial, on the ground that he intended to invoke the Fifth Amendment privilege not to testify. Defense counsel later subpoenaed Marano to testify, and he again asserted the privilege, claiming that he feared for his personal safety. At a hearing on the issue, defense counsel presented a specific set of questions that he proposed to ask Marano. The trial judge found his claim of fear for his safety to be a valid basis for pleading the Fifth Amendment. On appeal, this court reversed and held that

the district court simply accepted Marano's blanket assertion of the fifth amendment privilege in response to all questions asked of him and did not undertake a particularized inquiry to determine whether the assertion was founded on a reasonable *fear of prosecution* as to each of the posed questions. This was error. *Id.* at 53 (emphasis added).

Here, the facts are clearly distinguishable from those in *Zappola.* First, a specific set of questions had been proposed by defense counsel in *Zappola,* whereas no specific questions had been proposed by appellant's counsel herein. Second, a pending and related grand jury investigation into Law's activities could have resulted in additional charges being filed against her. Thus, it is difficult to imagine what further questions Judge Daly needed to ask of Law to enable him to decide whether her claim of privilege was validly asserted. In contrast, in *Zappola,* Marano already was named as the sole defendant in a pending indictment in an unrelated case, so that the charges against him at the time he sought to assert the Fifth Amendment privilege were clearly defined. Thus, the district judge could have asked Marano specific questions in order to assess the likelihood of incriminatory statements with regard to the pending charge, which might have been elicited in responding to defense counsel's proposed questions. Third, Law declined to testify based on the fact of a pending investigation whereas Marano declined to testify based on fear for his personal safety, which is not a valid basis for assertion of the privilege. These several significant differences explain why it was reasonable to require further questioning of the witness in *Zappola* but to find that it was unnecessary in this case.

B. *Admission of Statements under Rule 804 of the Federal Rules of Evidence*

Appellant next contends that the district court erred in denying admission into evi-

---

**9.** Of the United States District Court for the Southern District of New York, sitting by des-

ignation.

dence of statements about the transactions herein made by Law to Robert Porter, a defense investigator, pursuant to Fed.R. Evid. 804(b)(3) or 804(b)(5).[10]

Rule 804(b)(3) states that if a declarant is unavailable, an exception to the rule against hearsay exists for statements against interest.[11] Under Rule 804(b)(3), a statement is admissible if three requirements are met: (1) the declarant is unavailable; (2) the statement was at the time of its making against the declarant's (penal) interest; and (3) corroborating circumstances clearly indicate the trustworthiness of the statement.

Here, there is no dispute between the parties that the unavailability requirement was met. Under Fed.R.Evid. 804(a)(1), the assertion of privilege explicitly makes the declarant unavailable.

We need not address whether the second requirement was met since we hold that the statements were inadmissible because the third requirement—that of corroboration—was not met. The corroboration requirement of the Rule should be construed to effectuate its purpose of "circumventing fabrication." Notes of Advisory Committee on Proposed Rules, Rule 804. The Committee viewed statements tending to exculpate the accused as more suspect than other types of statements against interest, hence conditioned their admissibility on proof of corroborating circumstances. The House Judiciary Committee observed that "simple corroboration was . . . deemed ineffective to accomplish [the purpose of ensuring trustworthiness] since the accused's own testimony might suffice while not necessarily increasing the reliability of the hearsay statement." Notes of Committee on the Judiciary, House Report No. 93–650, U.S.Code Cong. & Admin.News 1974, pp. 7051, 7089. Here, appellee argues, the only corroboration for the statements by Law to Porter are appellant's own statements. This is the precise situation which the House Committee anticipated when it indicated that more reliable corroboration is required.

10. Appellant's offer of proof with regard to Porter's testimony stated that Porter would testify to the following:

On March 25, 1982 and March 29, 1982, Porter had telephone conversations with Law. During these conversations, Law stated:

a. Law received appellant's original birth certificate in the name of "Barbara Rose Lutzick" and other items of personal identification, including checkbooks and car payment books, in March or April, and kept them in a safe place. At the time appellant gave these items to Law, Law did not intend to use them for illegal purposes; rather, she planned to hold them for safekeeping.

b. Law thus had appellant's original birth certificate at the time she applied for a duplicate. The letter requesting a duplicate birth certificate was written by Law because appellant had requested the birth certificate which she believed she needed to get a Connecticut driver's license. Law did not indicate to appellant that she still had the original birth certificate, which appellant apparently thought had been seized during a raid of the premises.

c. Appellant had no knowledge that Law used appellant's original birth certificate to get a driver's license.

d. Law had filled out a false passport application, and appellant was not informed that it had been filled out in the name "Barbara Rose Lutzick." The information about appellant and her parents that Law had used to fill out the application was taken from appellant's original birth certificate.

e. Law did not tell appellant exactly what transpired in the passport office, nor did she reveal at that time that appellant's original birth certificate had been used to get a false driver's license.

f. Law could not recall the events about the purse that transpired following her arrest on November 18.

To the extent that the above stated proffered evidence would have been conclusory, or would have purported to state what Rodriguez knew or believed, it would have been incompetent evidence.

11. The rule defines such a statement as:

[one] which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Apropos the denial of admission of Porter's testimony under Rule 804(b)(5), the requirements of the Rule are explicit not only with respect to "guarantees of trustworthiness" but also with respect to notification. The proponent must notify the adverse party of his intention to offer the statement sufficiently in advance of the trial to provide the adverse party with "a fair opportunity to prepare to meet it." Here, the notification requirement of Rule 804(b)(5) was not met.

A district court's ruling excluding evidence under Rules 804(b)(3) and 804(b)(5) is reviewable only for an abuse of discretion. *United States v. Beltempo,* 675 F.2d 472, 480 (2d Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982); *United States v. Winley,* 638 F.2d 560, 562 (2d Cir.1981), *cert. denied,* 455 U.S. 959, 102 S.Ct. 1472, 71 L.Ed.2d 678 (1982). In light of our discussion herein, we do not find an abuse of discretion and, therefore, we affirm the district court's ruling that the statements were not admissible.

## C. *Sufficiency of Evidence*

Appellant contends that the trial court erred in denying her motion for judgment of acquittal as to Count One, which charged her with aiding and abetting another in making a false statement on a passport application. In particular, appellant argues that appellee failed to prove that she had intentionally furnished documents and information to Law on or about November 18, 1981, which Law used to make the false statements. This argument is without merit.

In deciding the motion, the trial judge must determine:

whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion.... If he concludes that either of the two results, a reasona-

ble doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter.

*United States v. Lieberman,* 637 F.2d 95, 104–05 (2d Cir.1980) (*quoting Curley v. United States,* 160 F.2d 229, 232–33 (D.C. Cir.), *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947)). Further, the jury's verdict on the matter "must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

We agree with the district court that enough evidence was presented by the government so that a reasonable mind could conclude that appellant had engaged in the alleged conduct. *United States v. Artuso,* 618 F.2d 192, 195 (2d Cir.), *cert. denied,* 449 U.S. 861, 101 S.Ct. 164, 66 L.Ed.2d 77 (1980). Highlights of the evidence presented by the government showed: Law had obtained specific information about appellant's family members; a videotape showed appellant standing by Law's side while Law submitted the passport application; and appellant apparently attempted to conceal evidence that had been in Law's purse at the time of Law's arrest. A juror could reasonably conclude from this evidence that appellant was aware of Law's intention to obtain a passport using false information and that appellant assisted Law in effectuating this goal.

## D. *Motion to Compel Election of Counts*

Finally, appellant contends that the district court erred in denying appellant's motion to compel an election of counts, arguing that defendant cannot be charged and convicted lawfully of both aiding and abetting *and* being an accessory after the fact. Whether or not it is permissible to convict a defendant of both, appellant's argument is without merit since it is permissible to charge a defendant with both, *see United States v. Gaddis,* 424 U.S. 544, 550, 96 S.Ct. 1023, 1027, 47 L.Ed.2d 222 (1976), and here appellant was convicted of only one.

For all of the above stated reasons, the judgment of the district court is affirmed.