**UNITED STATES of America, Appellee,**

v.

**Sher Malik BAHADAR, Defendant–Appellant.**

**No. 366, Docket 91–1263.**

United States Court of Appeals, Second Circuit.

Argued Nov. 20, 1991.

Decided Jan. 22, 1992.

Ira Belkin, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., Susan Corkery, Asst. U.S. Atty., E.D.N.Y., of counsel), for appellee.

Spencer Weber Waller, Brooklyn, N.Y., for defendant-appellant.

Before PRATT, MAHONEY and McLAUGHLIN, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Sher Malik Bahadar appeals from a judgment of conviction entered after a jury trial before John R. Bartels, *Judge.* Bahadar was convicted of conspiracy to possess with intent to distribute over one kilogram of heroin, attempted possession of over one kilogram of heroin, and possession with intent to distribute heroin. *See* 21 U.S.C. §§ 841(a)(1), 846. Bahadar makes five claims of error, all of which we reject. We write principally to address the proper role of defense witness immunity and the applicability of our recent decision in *United States v. Salerno,* 937 F.2d 797 (2d Cir. 1991), *petition for cert. filed* (U.S. Nov. 27, 1991) (No. 91–872), to the exculpatory hearsay statement of an unavailable witness offered as a statement against penal interest under Fed.R.Evid. 804(b)(3).

## FACTS AND BACKGROUND

At this point we summarize only the basic facts; other portions of the factual and procedural background are addressed later in the opinion where specifically relevant to the legal analysis.

The arrests of Sher Malik Bahadar and Mohammed Ali were the result of a Drug Enforcement Administration ("DEA") investigation of Pakistani drug smugglers. The DEA's informant, Shaheen Manzour (who used the name "Hagi"), pretended to be the courier for a 1.5 kilogram shipment of Pakistani heroin. In preparation for the deal, Manzour engaged in numerous phone conversations with Ali, most of which dealt with the time and place for the exchange. In these conversations, Ali made occasional reference to a confederate named "Abdul", who wanted to give "Hagi" the $5,000 courier fee and would actually receive the heroin. After several of these conversations, Ali and "Hagi" agreed that the transaction would take place on April 9, 1990.

At 1:15 pm on April 9, DEA special agents Clay Price and Mike Smith began conducting surveillance of Ali at his place of employment, the Bionic Bagel on Nostrand Avenue in Brooklyn. At 2:00 pm, Ali left the Bionic Bagel and got into his car. Approximately twenty minutes later, Ali pulled up at an apartment complex in Brooklyn. After Ali had entered one of the buildings, returned to his car, and began to reenter the apartment building, Bahadar pulled up and parked on the same side of the street as had Ali. Bahadar left his car and walked up to Ali; the two of them then returned to Bahadar's car and drove to a pay phone at Avenue Z and First Street. Ali got out and appeared to make a phone call.

After that stop, Ali and Bahadar were observed at approximately 2:45 pm returning to the apartment complex. They returned to Bahadar's car at 3:15 pm, whereupon Bahadar drove Ali to another set of pay phones at Avenue X and First Street. When the DEA agents caught up to them, Bahadar appeared to be on the phone. Bahadar then handed the receiver to Ali and stood by as Ali continued the conversation. After they left this public telephone, Ali and Bahadar drove to the Ceasar's Bay Bazaar parking lot along the Belt Parkway. They both got out of the car and walked around the parking lot, pointing at both the Crossland Bank and the Citibank located there.

At approximately 3:30 (the same time that agents Price and Smith observed Ali and Bahadar making a phone call at Avenue X and First Street), "Hagi" returned a phone call made to his beeper. A person who identified himself as "Khan" answered, and told "Hagi" to hold on for a minute so that "the concerned person" could talk to him. A moment later, Ali came on the line and made arrangements to meet "Hagi" between 5:00 and 5:30 pm outside the Crossland Bank at Ceasar's Bay Bazaar shopping plaza. Ali told "Hagi" that he would be wearing a white cap for identification purposes.

After returning to the apartment complex yet again, Ali and Bahadar returned to Bahadar's car. Bahadar drove Ali back to the Ceasar's Bay Bazaar plaza, and Bahadar parked in front of the Citibank, where Bahadar got out and walked around the

area for a few minutes. When Bahadar returned to the car, Ali got out, wearing a white hat, and walked over to the Crossland Bank branch while Bahadar remained in his car, moving it to different positions in the parking lot about five times.

Around 5:30 pm, Manzour ("Hagi") arrived at the Crossland bank, and Ali got into "Hagi"'s car. They talked for two or three minutes, then got out of the car and began walking toward Bahadar's car, which was then parked near the Citibank. Both Manzour and Ali got into Bahadar's car. After Manzour and Bahadar exchanged pleasantries, Ali asked Manzour, "[W]here is the stuff"? Manzour replied by asking, "[W]here is the money"? Bahadar reached into the glove compartment of his car and produced a bag containing $4,000. As Manzour was looking at the money, Bahadar told Ali (in Punjabi) to "look at the stuff and check it as well."

After Ali assured Manzour that the bag contained the promised $5,000, the two of them returned to Manzour's car, where Manzour produced a clothing-wrapped shopping bag containing 1700 grams of white flour and two grams of heroin. Manzour gave this package to Ali, and as Ali began walking back to Bahadar's car, both Ali and Bahadar were arrested.

## DISCUSSION

On appeal, Bahadar claims (1) that Judge Bartels improperly allowed Ali to assert his fifth amendment privilege against self-incrimination; (2) that Judge Bartels should have granted Ali immunity; (3) that since Ali was unavailable to testify, one of his statements—which, Bahadar argues, exculpated him—should have been admitted as a statement against penal interest under Fed.R.Evid. 804(b)(3); (4) that Judge Bartels committed reversible error by permitting the government to read English language translations of tape-recorded conversations instead of playing the tapes themselves in their original languages (primarily Punjabi and Urdu); and (5) that there was insufficient evidence that Bahadar knew that heroin was involved in the transaction.

We address each of these arguments in turn.

### A. Ali's fifth amendment privilege

■ Ali, who had been charged in the same three-count indictment as had Bahadar, quickly confessed to his participation in the heroin smuggling scheme. He told the DEA that "Bahadar knew we were going to [Ceasar's Bay Bazaar] to meet Haji, get the 1.5 kilograms of heroin and pay Haji $5,000.00 in courier fees", and that Ali "would call Bahadar each day to tell him about what was going on so that he would be ready when I needed him." Bahadar's counsel wished to call Ali, who had yet to be sentenced, in order to establish his defense that Bahadar was nothing more than an unwitting driver with no knowledge whatsoever of the transaction. After some initial confusion regarding whether Ali would claim the privilege, Ali did in fact invoke the fifth amendment. Over objection by Bahadar's counsel, Judge Bartels concluded that Ali had a valid fifth amendment privilege.

Initially, we note that since Ali had not been sentenced on the count to which he pled guilty (and was faced with two open counts, later dismissed by the government), any testimony which he gave at Bahadar's trial could have been used as the basis for an upward departure at sentencing, *see United States v. Domenech*, 476 F.2d 1229, 1231 (2d Cir.), *cert. denied*, 414 U.S. 840, 94 S.Ct. 95, 38 L.Ed.2d 77 (1973), or as evidence to support a prosecution on the two open counts. Moreover, had he contradicted his prior statements—which would have been necessary in order to exculpate Bahadar—Ali would have exposed himself to a charge of having willfully obstructed the administration of justice, either by "providing a materially false statement to a law enforcement officer" during the investigation (or by "providing materially false information to a judge" during the prosecution) of the "instant offense"; either way, he would have been subjecting himself to a two-point sentence enhancement. *See* U.S.S.G. § 3C1.1, comment. (nn. 3(f), 3(g)); *United States v. Perdomo*, 927 F.2d 111, 118 (2d Cir.1991).

Bahadar argues that since Judge Raggi, the district judge entrusted with Ali's sentencing, was ready, willing, and able to sentence Ali immediately, Judge Bartels should have ensured that Ali was promptly sentenced in order to remove any impediment to Ali's testimony. Bahadar suggests that the government purposely left Ali unsentenced so as to avoid Bahadar's use of his exculpating testimony at trial.

We are aware that the structure of the criminal justice system allows for the possibility of such a sharp practice. And, in such a case, we might utilize a judicial remedy for such prosecutorial overreaching. *See, e.g., United States v. Pinto,* 850 F.2d 927, 935 (2d Cir.) (suggesting that in a case of prosecutorial overreaching, a trial court may, in proper circumstances, order the government to grant immunity to a defense witness), *cert. denied sub nom. Vence v. United States,* 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988). However, the failure to sentence Ali had no effect on the proper invocation of his fifth amendment privilege. Indeed, had Ali been sentenced, and the open counts against him dismissed, he still could have been prosecuted in a separate indictment for the crime of perjury once he testified contrary to his prior statements. *See* 18 U.S.C. § 1621. Thus, there is no merit to Bahadar's claim that Ali had no valid fifth amendment privilege to invoke.

**B.** *"Judicial" immunity*

Bahadar further argues that under *United States v. Pinto, supra,* Judge Bartels should have ordered the government to immunize Ali or risk dismissal of the indictment. We reject this claim as well.

■ As we have repeatedly held, the fifth amendment does not require "that defense witness immunity must be ordered whenever it seems fair to grant it." *United States v. Turkish,* 623 F.2d 769, 777 (2d Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981). We have recently reaffirmed the long-standing principle that "[i]mmunity remains 'preeminently a function of the Executive Branch.'" *United States v. Salerno,* 937 F.2d at 807

(quoting *United States v. Turkish,* 623 F.2d at 776). The statute which confers the power to grant immunity in court and grand jury proceedings, 18 U.S.C. § 6003(a), gives the district courts the power to issue orders requiring individuals to give testimony only "upon the request of the United States attorney for such district". However, on rare occasions judges have been asked to use their coercive powers to force the government to grant immunity. One of the early suggestions that district judges might involve themselves in the decision whether to grant immunity came in the lowest form of dicta—a footnote. In *Earl v. United States,* 361 F.2d 531 (D.C.Cir.1966), *cert. denied,* 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967), Judge (later Chief Justice) Burger suggested that in a case where the government uses the immunity statute by granting immunity to one witness while declining to grant immunity to a defense witness, "[a]rguments could be advanced" that the immunity statute violates due process *as applied. Id.* at 534 n. 1. *Accord United States v. Alessio,* 528 F.2d 1079, 1082 (9th Cir.) (*Earl* requires the court to inquire whether the defendant "was denied a fair trial because of the government's refusal to seek immunity for defense witnesses"), *cert. denied,* 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976).

Building on *Earl,* the third circuit, in a 2–1 decision, directed that "when prosecutorial misconduct caused the defendant's principal witness to withhold out of fear of self-incrimination testimony which would otherwise allegedly have been available to the defendant", the district judge must order a judgment of acquittal unless the government requests use immunity for the defense witness's testimony. *United States v. Morrison,* 535 F.2d 223, 229 (3d Cir. 1976).

The third circuit went even further in *Government of Virgin Islands v. Smith,* 615 F.2d 964 (3d Cir.1980), where it held that—regardless of the immunity statutes—a judicially-crafted use immunity for essential defense witnesses was an appropriate remedy to protect the right to

present an effective defense. *Id.* at 970–74. The difference between *Morrison's* carrot-and-stick approach to persuading the government to grant immunity and *Smith's* judicially-granted immunity may be one of no practical significance, but it does illustrate the tensions—and proposed solutions—caused by the government's unilateral power to grant use immunity.

This circuit has followed the carrot-and-stick approach, leaving the immunity decision to the executive branch but interposing the judicial power to subject the government to certain choices of action. *See, e.g., United States v. Salerno,* 937 F.2d at 807–08 ("the government is in no way *required* to grant use immunity to a witness called by the defense; it is simply left with a series of choices") (emphasis in original); *United States v. Praetorius,* 622 F.2d 1054, 1064 (2d Cir.1979) (citing dictum in *United States v. Wright,* 588 F.2d 31, 35 (2d Cir.1978), *cert. denied,* 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979), which suggested that "extraordinary circumstances" might require the government to confer use immunity on a defense witness), *cert. denied sub nom. Lebel v. United States,* 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980).

In *United States v. Burns,* 684 F.2d 1066, 1077 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983), we distilled from our prior cases a three-part test for requiring the government to grant defense witness immunity at the risk of dismissal of the indictment. First, the district court must find that the government has engaged in discriminatory use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the fifth amendment. Second, the witness's testimony must be "material, exculpatory, and not cumulative". Third, the testimony must be unobtainable from any other source. We cited this three-part test approvingly in *United States v. Calvente,* 722 F.2d 1019, 1025 (2d Cir.1983), *cert. denied,* 471 U.S. 1021, 105 S.Ct. 2030, 85 L.Ed.2d 313 (1985) and, most recently, in *United States v. Pinto,* 850 F.2d at 935.

■ As we have noted in part A of this opinion, Ali's invocation of his fifth amendment privilege was proper because, to exculpate Bahadar, Ali would have had to contradict his prior statements to government agents, thereby exposing himself to further criminal liability. His invocation of the fifth amendment was not the result of a discriminatory use of immunity by the government, nor of any other prosecutorial overreaching. In fact, it seemed to be solely the result of Ali's own willingness to change his story. Thus, Bahadar cannot vault the first hurdle of the *Burns–Calvente–Pinto* test, and his claim that the government should have utilized its power to grant Ali immunity must be rejected. Indeed, it bears noting that although our test for requiring the government to grant use immunity has been in place for at least eight years, we have yet to be presented with a case in which the defendant gets over the first hurdle, let alone succeeds entirely.

### C. *Fed.R.Evid. 804(b)(3)*

Ali told "Hagi" that "Abdul" was a participant in the heroin dealings and was coming with Ali to the Ceasar's Bazaar transaction to hand "Hagi" the money. However, once arrested, Ali changed his story. On April 9, 1990, Ali confessed to his culpability and added: "Although I told Haji that Bahadar was Abdul, I lied to him. * * * Abdul is a male Pakistani who was to come and get the heroin from me at my house the next day." Five days later, Ali made another statement, which was summarized by the government as: "[Bahadar] was not Abdul. [Bahadar] only knew that Ali was going to buy some 'illegal things' from ["Hagi"]. * * * [Ali] made a mistake when he told the reporting agent that [Bahadar] knew about the heroin ["Hagi"] was delivering to Ali." This same statement alleged that "Abdul" was a 50–year–old male Hispanic named Lumeno, who was listed in Ali's telephone book under the name of "Wong". On October 4, 1990, Ali gave a sworn statement to Bahadar's attorney stating that Bahadar was not "Abdul". Instead, "Abdul who is involved in drugs,

his name is Rievera and I have seen him. He lives in C 2 in Bronx."

Since Bahadar was unsuccessful in getting direct testimony by Ali in front of the jury, he tried the next-best thing: a hearsay exception for Ali's prior exculpatory statement. The exception Bahadar tried to invoke was Fed.R.Evid. 804(b)(3), which provides:

> **(3) Statement against interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Fed.R.Evid. 804(b)(3). Such a statement is admissible if (1) the witness is "unavailable", *see* Fed.R.Evid. 804(a), and (2) it satisfies the requirements of Fed.R.Evid. 804(b)(3), including the requirement that "corroborating circumstances clearly indicate the trustworthiness of the statement". Our review is solely for abuse of discretion. *United States v. Salvador,* 820 F.2d 558, 561 (2d Cir.), *cert. denied,* 484 U.S. 966, 108 S.Ct. 458, 98 L.Ed.2d 398 (1987).

■ **1. Unavailability.** Our initial inquiry is whether Ali was "unavailable". We start with the text of the rule. Fed. R.Evid. 804(a)(1) states that a declarant who "is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement" is unavailable. As we recently stated in *United States v. Salerno,* "[w]e have long recognized that 'unavailability' includes within its scope those witnesses who are called to testify but refuse based on a valid assertion of their fifth amendment privilege against self-incrimination." 937 F.2d at 805 (citing cases).

However, there has been some suggestion that *United States v. Salerno* might be read to support the proposition that "a witness is 'available' to the prosecution because use immunity can be conferred". *See United States v. Salerno,* 952 F.2d 624 (2d Cir.1991) (Newman, J., dissenting from denial of rehearing *in banc*). Thus, so the argument goes, the government would be unable to invoke any of the rule 804(b) hearsay exceptions in criminal cases, since the government always has the ability to immunize a witness who claims the fifth amendment privilege and thereby make that witness available.

Such an interpretation of *United States v. Salerno* would be an unrealistic reading of the rules of evidence, of the law of immunity, and of the *Salerno* decision itself. The discussion of rule 804(a)(1) in *Salerno* provided a background for our analysis of rule 804(b)(1), the former testimony exception, which was there in issue. Thus, on rehearing, the panel clearly limited its discussion of "availability" to the narrow circumstances presented under rule 804(b)(1). *United States v. Salerno,* 952 F.2d 623 (2d Cir.1991).

Of all of the hearsay exceptions in Fed. R.Evid. 804, former testimony is a special case. It is "the strongest hearsay", *see* Fed.R.Evid. 804 advisory committee's note, because "[c]ross-examination, oath, the solemnity of the occasion, and in the case of transcribed testimony the accuracy of reproduction of the words spoken, all combine to give former testimony a high degree of credibility." Edward W. Cleary, *McCormick on Evidence* § 254, at 760 (3d ed. 1984). The other rule 804 hearsay exceptions (statement under belief of impending death, statement against interest, statement of personal or family history) lack these reliability-enhancing factors.

In *Salerno,* Bruno and DeMatteis had testified before the grand jury under immunity granted by the government. In front of the grand jury, they testified that the illegal enterprise which formed the core of the government's case simply did not exist.

At trial, after Bruno and DeMatteis claimed the fifth amendment privilege, the defendants offered their grand jury testimony under rule 804(b)(1). The government objected, claiming that its motive to examine them in the grand jury was not similar to its motive at a trial. This was so, claimed the government, because they believed that the witnesses had lied to the grand jury, and the government had no motive to pursue the matter in front of the grand jury. *United States v. Salerno*, 937 F.2d at 806.

We rejected the government's "dissimilar motive" argument, discussing rule 804(a) merely as an introduction and aid to our construction of rule 804(b)(1). The government created the testimony of Bruno and DeMatteis in the first instance by granting them use immunity in front of the grand jury. But, when confronted with the possibility that the grand jury testimony might be admitted at trial, the government sought to rely on the "similar motive" requirement of rule 804(b)(1) as a shield to prevent admission of that testimony, even after it had identified Bruno and DeMatteis as *"Brady* witnesses". *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Because the "similar motive" requirement is bottomed on rule 804(b)(1)'s overall goal of preserving adversarial fairness, we concluded in *Salerno* that it could not be invoked by the government. Preservation of adversarial fairness for the government was neither needed nor intended in a situation where the government itself created the testimony in the first instance and where it, alone, could compel live testimony from the same witnesses at trial. We thus declined to allow the government to hide behind the protective "similar motive" shield that is written into rule 804(b)(1). *United States v. Salerno*, 937 F.2d at 807.

Other circuits have rejected the government's efforts to use the protective provisions of rule 804(b)(1) in identical circumstances. *See, e.g., United States v. Miller*, 904 F.2d 65, 68 (D.C.Cir.1990) ("Before the grand jury and at trial, [the witness's] testimony was to be directed to the same issue—the guilt or innocence of [the grand

jury targets].")*; United States v. Lester*, 749 F.2d 1288, 1301 (9th Cir.1984); *United States v. Young Bros., Inc.*, 728 F.2d 682, 691 (5th Cir.), *cert. denied*, 469 U.S. 881, 105 S.Ct. 246, 83 L.Ed.2d 184 (1984); *United States v. Klauber*, 611 F.2d 512, 516–17 (4th Cir.1979), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980). *Cf. United States v. Vigoa*, 656 F.Supp. 1499, 1505 (D.N.J.1987), *aff'd mem.* 857 F.2d 1467 (3d Cir.1988).

To summarize: Our decision in *Salerno*, contrary to the fears of the *in banc* dissenters and the government, did not change the concept of "unavailability" as defined in Fed.R.Evid. 804(a)(1). When a fifth amendment privilege is properly asserted by a trial witness, that witness becomes "unavailable" for purposes of rendering potentially applicable all of the hearsay exceptions described in rule 804(b). *United States v. Salerno*, 937 F.2d at 805; *United States v. Salvador*, 820 F.2d at 560; *United States v. Rodriguez*, 706 F.2d 31, 40 (2d Cir.1983); *United States v. Beltempo*, 675 F.2d 472, 480 (2d Cir.), *cert. denied*, 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982). Each of those exceptions, of course, has its own special requirements for admissibility. Applying those principles here, we conclude that by invoking a valid fifth amendment privilege, Ali became "unavailable" under rule 804(a)(1), and we therefore turn to whether his prior statements as offered by Bahadar met the requirements of the 804(b)(3) hearsay exception for statements against penal interest.

■ **2. Against penal interest.** Once Judge Bartels ruled that Ali had a valid fifth amendment privilege, Bahadar's counsel attempted to introduce Ali's prior statements under Fed.R.Evid. 804(b)(3), the hearsay exception for statements against interest. Essentially, rule 804(b)(3) requires that the statement—to be admissible—must have been, at the time it was made, so far contrary to the declarant's best interests that a reasonable person would not make the statement unless the declarant believed it to be true. Fed. R.Evid. 804(b)(3). Once that determination

is made, the inquiry ends—unless the statement would simultaneously expose the declarant to criminal liability and exculpate the accused. In that case; the last sentence of rule 804(b)(3) applies, requiring corroborating circumstances to "clearly indicate the trustworthiness of the statement". *Id.*

In the district court, Bahadar attempted to introduce Ali's May 14, 1990, statement under rule 804(b)(3). Bahadar argued that corroborating circumstances existed, since "the exculpatory statement was given when this witness was making a proffer to the Government in order to work out a cooperation agreement, [therefore,] it was to [Ali's] advantage to tell the truth." In ruling the statement inadmissible, Judge Bartels said, "I don't think it's against penal interest."

On appeal, Bahadar argues that since Ali's fifth amendment privilege against self-incrimination was upheld, "[i]t is absurd for the government to argue in the same breath that the very same statements were not against Ali's penal interest." An intriguing argument, to be sure, but we need not address it, because the last requirement of rule 804(b)(3)—that of corroboration—was not met by Bahadar. "The corroboration requirement of the Rule should be construed to effectuate its purpose of 'circumventing fabrication.'" *United States v. Rodriguez,* 706 F.2d at 40 (quoting Fed.R.Evid. 804 advisory committee's note). To this end, our cases have required corroboration of both the *declarant's* trustworthiness as well as the *statement's* trustworthiness. *United States v. Salvador,* 820 F.2d at 561–62.

In this case, both are lacking. Ali was "all over the place" when it came to the issues of what Bahadar knew and who "Abdul" was. Depending on which of Ali's statements is believed, Bahadar either knew about the heroin, or he just knew that Ali was going to buy some "illegal things"; "Abdul" was either the Pakistani Bahadar, or another male Pakistani, or the Hispanic Lumeno (also known as "Wong"), or Rievera. The circumstances simply do not corroborate the trustworthiness of the proffered statement at all. Rather, the circumstances—repeated changes in Ali's story—would properly make any district judge suspicious of the statement's reliability. Moreover, there is some suggestion in the record that these repeated changes were occasioned by a threat made by Bahadar against Ali's family. In view of the serious risk of fabrication, compounded by the lack of corroboration, Judge Bartels was well within his discretion in refusing to admit Ali's statement under rule 804(b)(3).

■ Because Ali's statement lacked "corroborating circumstances" clearly indicating its trustworthiness as required by rule 804(b)(3), the statement obviously lacks "equivalent circumstantial guarantees of trustworthiness", so Bahadar's claim that the statement should have been admitted under Fed.R.Evid. 804(b)(5) (the "residual exception") must be rejected as well.

## D. *English language translations*

■ Bahadar claims that the district court "committed reversible error in its handling of the transcripts of the tape recorded conversations introduced by the government." Rather than having the transcripts read to the jury, Bahadar claims that the court should have played the tapes and provided the transcripts only as an aid to the jury. He argues further that the court failed to give a proper jury instruction regarding the tapes. We must reject these claims.

The tape-recorded conversations were in a mixture of English and the Pakistani dialects of Punjab and Urdu; they had been translated into English and transcribed. Bahadar claims that these procedures "precluded the jury from fulfilling its function as the sole judge of the facts in assessing the identification of the speakers, the tone of the voices, and the accuracy of the transcription where the conversations were in English."

Bahadar only selectively acknowledges the facts. Before the government began playing the tapes, the following limiting instruction was given:

The transcripts are translations of the tapes. They're given to the jury because that's the only way you can understand what the tapes have stated. I doubt whether any members of the jury can understand Punjab or Urdu or whatever it is, and that's the only reason why we have these translations. Otherwise, the tapes alone would be in evidence.

The transcripts are in evidence in order to assist you to find out what the tapes say. If you want to hear any of the tapes, want—he will read them to make sure they're translated correctly, and they will certainly be available for you to do so, ladies and gentlemen.

As the assistant United States Attorney played the first tape, Judge Bartels interrupted, and the following colloquy among Judge Bartels, AUSA Belkin, and John Apicella (Bahadar's trial counsel) ensued:

THE COURT: I'm sorry, may I interrupt for a second? Of course, I don't understand everything that comes off that tape. I don't think the jury does either. When are we going to read the transcripts, after we hear the tape? Do you think we understand? I don't know whether the jury understands what's coming over that tape.

MR. BELKIN: I would ask everyone to try to follow along, read the transcript as the tape is playing.

THE COURT: How can you follow along with this transcript and those tapes? I don't see how you can link them together unless you have education in the Pakistani language. I don't know, I think it would be better [to] read it, come back, read the transcripts. I could be wrong but I doubt whether the jury understands those tapes. Without the reading of the transcripts in English, what good is this, this noise?

Do you have a suggestion?

MR. BELKIN: Your Honor, I would be happy to proceed by reading the transcripts, perhaps having the witness [Manzour] read his part of the conversation and I could read the other part of the conversation.

THE COURT: That's the only way I can understand it. Maybe I'm not as bright as all of you, but I can't understand this.

MR. APICELLA: Your Honor, I would object to the U.S. Attorney playing a part in reading the transcripts.

THE COURT: How would you do it?

MR. APICELLA: The jury has already been provided with the Government's alleged translations. They can follow along, read it.

THE COURT: You can take the other side if you wish.

MR. APICELLA: I don't want to take the other side, your Honor.

During the reading of the transcripts, Apicella objected to the intonations being used by the AUSA, and read portions of the transcripts to the jury himself. Also, at two points during the reading of the transcripts, the tapes themselves were played, as significant portions of the conversations were in English.

Moreover, the jurors were reminded at least six times during closing arguments—by both sides—that they had the tapes and could listen to them. In addition to the limiting instruction given earlier by Judge Bartels, he reminded them during his final charge to the jury that the tapes were part of the evidence submitted in the case.

While the general, and preferred, practice in dealing with tape-recorded evidence is to play the tapes and allow transcripts only as an aid, we do not believe that Judge Bartels abused his discretion by utilizing the procedures that he did, especially since the tapes were mostly in foreign tongues, *see United States v. Marin*, 513 F.2d 974, 977 (2d Cir.1975) (allowing Spanish-to-English transcripts into the jury room), since listening to the tapes would have been a "long and cumbersome" enterprise, *see United States v. Koska*, 443 F.2d 1167, 1169 (2d Cir.) (*per curiam*), cert. denied, 404 U.S. 852, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971), and since Bahadar's counsel not only cross-examined the translator of the tapes as to her competence, but also argued her translation abilities to the jury in summation. We see no abuse of discretion in Judge Bartels' handling of the mostly-

foreign tape-recorded evidence; on the contrary, we find it hard to imagine any other proper and effective handling of this evidence.

### E. *Sufficiency of the evidence*

 Finally, Bahadar claims that there was insufficient evidence to prove that Bahadar was aware that he was aiding a scheme to possess and distribute heroin. There was easily enough evidence for a reasonable jury to conclude that Bahadar knew that the transaction involved heroin; consequently, we must reject this claim as well.

It cannot be gainsaid that a defendant challenging the sufficiency of the evidence bears a "very heavy burden". *See, e.g.,* *United States v. Rodriguez,* 943 F.2d 215, 219 (2d Cir.1991). We must uphold Bahadar's conviction if, "after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). Here, the only element of the charged offenses which Bahadar challenges is his knowledge that the object of the transaction was heroin.

A rational trier of fact could certainly have concluded that Bahadar knew that heroin was involved in this transaction, or at least that he consciously avoided discovering the specific object of the transaction. The fact that Bahadar was never point-blank told "this is a heroin transaction" will not suffice to reverse his convictions. Indeed, a $4,000 cash transaction in a parking lot, arranged by driving to various pay phones and calling a beeper, "should have apprised [Bahadar] of the unlawful nature of his conduct", *United States v. Guzman,* 754 F.2d 482, 489 (2d Cir.1985), *cert. denied,* 474 U.S. 1054, 106 S.Ct. 788, 88 L.Ed.2d 766 (1986), and properly served as the basis for the conscious avoidance charge given by the court.

Were we still in doubt as to Bahadar's knowledge, his strange maneuvering around the parking lot of the Ceasar's Bay Bazaar plaza indicates that he "drove evasively as though to discourage surveillance." *United States v. Tussa,* 816 F.2d 58, 62 (2d Cir.1987). Combined with the other facts and circumstances surrounding the transaction, a jury could easily infer guilty knowledge from this bizarre conduct. Moreover, the evidence showed that Bahadar told Ali to "look at the stuff and check it as well." If Bahadar truly did not know that the parking lot transaction was a heroin transaction, why was he so concerned with the contents of the package? Bahadar's concern with the contents of the package convinces us that even if Bahadar did not in fact know that heroin was to be purchased, it is only because "he deliberately closed his eyes to what otherwise would have been obvious to him." *United States v. Beech–Nut Nutrition Corp.,* 871 F.2d 1181, 1196 (2d Cir.), *cert. denied sub nom. Lavery v. United States,* 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989).

### CONCLUSION

The judgment of conviction is affirmed.