No. 12-1563-cr
United States v. Okatan

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

————————

August Term, 2012

(Argued: March 4, 2013     Decided: August 26, 2013)

Docket No. 12-1563-cr

————————

UNITED STATES OF AMERICA,

*Appellee*,

— v. —

TAYFUN OKATAN,

*Defendant-Appellant*.

————————

B e f o r e:

LYNCH, LOHIER, and CARNEY, *Circuit Judges*.

————————

Tayfun Okatan was convicted in the United States District Court for the Northern District of New York (Mae A. D'Agostino, *J.*) of three counts relating to illegally bringing an alien into the United States.  He raises a number of arguments on appeal, most of which we reject in a separate summary order filed along with this opinion.  This opinion addresses Okatan's challenge to the government's use of evidence that Okatan

1

asked to speak to a lawyer during an interrogation by a border patrol agent prior to his arrest. We conclude that use of this evidence in the government's case in chief violated Okatan's rights under the Fifth Amendment. We also conclude that the error was not harmless beyond a reasonable doubt.

VACATED and REMANDED.

―――――――――――

LAWRENCE ELMEN, FitzGerald Morris Baker Firth PC, Glens Falls, New York, *for* Defendant-Appellant.

RAJIT DOSANJH, Assistant United States Attorney (Edward P. Grogan, Assistant United States Attorney, *on the brief*), *for* Richard S. Hartunian, United States Attorney for the Northern District of New York, Syracuse, New York.

―――――――――――

GERARD E. LYNCH, *Circuit Judge*:

Following a jury trial in the United States District Court for the Northern District of New York (Mae A. D'Agostino, *J.*), defendant-appellant Tayfun Okatan was convicted of three counts relating to illegally bringing an alien into the United States. On appeal, Okatan raises a number of arguments, most of which we reject in a separate summary order filed along with this opinion. This opinion addresses Okatan's challenge to the government's use of evidence that Okatan asked to speak to a lawyer when a border patrol agent initiated an interview prior to his arrest. We conclude that use of this evidence in the government's case in chief violated Okatan's rights under the Fifth Amendment. Because we further conclude that the error was not harmless beyond a

2

reasonable doubt, we VACATE the judgment of the district court and REMAND the case for further proceedings consistent with this opinion.

## BACKGROUND

**I.     Factual Background**

"Because [Okatan] appeals from a judgment of conviction entered after a jury trial, the following facts are drawn from the trial evidence and described in the light most favorable to the government." United States v. Wilson, 709 F.3d 84, 85 (2d Cir. 2013), cert. denied, 133 S. Ct. 2876 (2013).

In the early hours of October 13, 2010, Okatan, a United States citizen, attempted to enter the United States from Canada at the Lewiston Bridge port of entry near Buffalo, New York.  Okatan had a passenger in his car, Munir Uysal, a German citizen.  Uysal was denied entry based on records indicating that he had previously overstayed a visa to the United States.  Customs and Border Protection ("CBP") officer Nghia Truong told Okatan that he was free to enter the country alone, but Okatan declined, explaining that he would drive Uysal to the Toronto airport to fly home.  Truong warned Okatan against attempting to bring Uysal back into the United States, and Okatan drove back into Canada.

The following morning, Okatan again attempted to enter the United States, this time alone, at the Champlain, New York port of entry.  He was questioned by CBP officer Patrick Curran.  Okatan told Curran that he had intended to visit his mother and sister in Canada, and that he had hoped to give his mother some money, but that she had been in

Florida. Okatan emptied his pockets at Curran's direction, producing an envelope containing over $5,000 in U.S. dollars plus some euros. Okatan was then interviewed by both Curran and officer Jason Sweet. A check of Okatan's license plate number had alerted the officers to Okatan's attempt to enter the United States with Uysal the preceding day. When asked, Okatan told the officers that he and Uysal had met in 2009 and belonged to the same congregation in Virginia. Uysal had flown to Toronto from Germany, and Okatan had met him at the airport in order to drive him to Virginia Beach. Okatan said that after Uysal had been denied entry at the Lewiston Bridge port of entry, the two men spent the night at a hotel in Ontario. The following morning, they drove into Quebec, where they argued at a rest stop. According to Okatan, Uysal wanted him to drive into the United States with Uysal in the trunk. When Okatan refused, Uysal walked off, and, when he did not come back, Okatan returned to the United States alone. After the interview, Sweet told Okatan that he would have to inspect his car and asked whether there was anything in the car that did not belong to him. Okatan said Uysal's luggage was in the trunk and agreed to leave it with border patrol.

Okatan then entered the United States. At CBP's request, Homeland Security Investigations agent Kevin Walczak followed Okatan's car south from Rouses Point, New York, for approximately 25 minutes and into Vermont, where he decided that Okatan was likely traveling home to Massachusetts. Later that day, however, Walczak again saw Okatan's car in the vicinity of Rouses Point. He followed the car briefly until Okatan abruptly pulled over to the side of the road, forcing Walczak to drive past him. Walczak

4

changed cars and caught up with Okatan, this time following him south until Okatan had left Walczak's usual area of responsibility. At that point, Walkczak abandoned his surveillance, but CBP officers continued to follow Okatan.

Meanwhile, also on October 14, 2010, Uysal walked into a convenience store in Mooers, New York – another port of entry not far from the one in Champlain – and waited for two or three hours. Noting that Uysal did not have a car, and considering how long he had been waiting, the owner of the store became suspicious and called border patrol. Agent Jerry Boucher and another agent responded to the call. They questioned Uysal, searched his pockets, and arrested him, transporting him to the Champlain border patrol station.

After leaving the station, Boucher drove to the Beekmantown rest area, the rest area closest to the convenience store at which Uysal had been arrested. As Boucher approached the rest area from the north on Interstate 87, he saw Okatan's car, which he recognized based on descriptions that he previously had heard at the border patrol station, driving in the opposite direction. Okatan passed a rest area on the northbound side of the road, directly across from the Beekmantown rest area, made a U-turn, and entered the Beekmantown rest area on the southbound side of the road. Boucher followed Okatan into the parking lot. Before Okatan could exit his car, Boucher activated his vehicle's lights and used its P.A. system to tell Okatan to remain inside his car.

Boucher walked over to Okatan's car, identified himself as a border patrol agent and asked Okatan if he was a United States citizen. Okatan said that he was and handed

over his passport. Boucher then asked why Okatan had passed the rest area on the east side of the highway and made a U-turn to enter the Beekmantown rest area. Okatan replied that he had to use the bathroom. Boucher warned Okatan that lying to a federal officer is a criminal act and asked whether he was there to pick someone up. Okatan said that he wanted a lawyer. At that point, Boucher placed Okatan under arrest and transported him to the Champlain border patrol station. According to Boucher, when Okatan and Uysal saw each other at the station, Uysal's face lit up and he looked like he was about to wave, but Okatan looked at the ground. Okatan and his car were searched, and $5,748 in U.S. dollars and $1,500 in euros were found.

## II.    Procedural History

Okatan was indicted on June 1, 2011, and charged with bringing and attempting to bring an alien into the United States in violation of 8 U.S.C. § 1324(a)(2)(B)(iii), attempting to transport an alien within the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), and encouraging and inducing an alien to enter the United States illegally in violation of 8 U.S.C. § 1324(a)(1)(A)(iv). Before trial, he moved to suppress statements he made to Boucher at the Beekmantown rest area. The district court granted the motion on November 2, 2011, but only with respect to "the statements [Okatan] made to Agent Boucher after he asked for a lawyer at the Beekmantown Rest Area on the basis they were obtained in violation of *Miranda*."

Agent Boucher testified during Okatan's three-day jury trial and, on direct examination, described his interaction with Okatan in the Beekmantown rest area.

Boucher explained that after Okatan told him he needed to use the bathroom,

> I then again asked him why would you come to this rest area? And he said something about the bathroom again, at which point I said to him something along the lines of, "It's against the law to lie to a federal agent, so don't lie to me. Why would you go past the northbound rest area, turn around and come back to this rest area?" And [I] may have said something like, "You are not here to pick anybody up or anything?" And he put his hands down and said he wanted a lawyer.

At that point, Okatan's attorney requested a mistrial because Okatan's "exercise[ of] his Constitutional right to remain silent is not a statement that's admissible and should not have come in for the jury." The judge denied the motion, explaining that she had already ruled that any statements made *after* Okatan requested a lawyer could not come in, and that Okatan's "voluntary statement[]" that he wanted a lawyer was not excluded pursuant to that ruling.

At the close of evidence, Okatan's attorney requested "that the Court structure a charge to ensure that the jury is not drawing any negative – any inference from [Boucher's testimony] that the defendant asked for counsel at that point, which was his Constitutional right." The court denied the request on the basis that it had explained to the jury in a preliminary charge that "the defendant has a Constitutional right to remain silent."

In its closing argument, the government recounted Okatan's interaction with Boucher, highlighting Okatan's request for a lawyer. The government reminded the jury that, after Boucher approached Okatan in the Beekmantown rest area,

7

Mr. Okatan identified himself, he's a naturalized citizen. What are you doing here? I have to go to the bathroom. You just drove past a rest area, you have to go to the bathroom. Are you here to pick somebody up? Have to go to the bathroom. So, crime to lie to a federal officer and then no more. No more talking. That's when he asked for his lawyer. Mr. Okatan, who was very chatty, was sweet and courteous, very friendly, when he was distancing himself from Uysal, very friendly with Officer Truong, now it's stage fright. You can't talk any more.

Okatan's attorney objected, and the court instructed the government to "move on to another topic." However, the government again alluded to the interaction later in its summation, suggesting that if Okatan had not been involved in illegal activity, "we would have had a little different experience . . . at the Beekmantown rest area . . . . Instead, there was [the] kind of conduct that someone who's been caught engaged in."

After the closing arguments, Okatan's attorney again complained of the government's references to Okatan's "invocation of his rights to counsel at the rest area" and the lack of a curative instruction. The court found no "undue prejudice," as the government's closing was "factually based," and intended to highlight that Okatan "had been very talkative before and he wasn't talkative at that point." The court therefore denied Okatan's renewed motion for a mistrial or, in the alternative, a curative instruction.

On November 9, 2011, the jury convicted Okatan of all three counts in the indictment. Okatan was sentenced on March 22, 2012 to time served in prison, five months of home detention and two years of supervised release; a $100 special assessment

was imposed for each count.  Judgment was entered on April 2, 2012.  Okatan appealed on April 15, 2012.

**DISCUSSION**

Okatan argues that the government violated the Fifth Amendment when it used as substantive evidence of guilt his pre-arrest request for a lawyer and his refusal to answer questions without one.  We agree.

**I.      Legal Standards**

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  The privilege "permits a person to refuse to answer questions, in formal or informal proceedings, where the answers might be used to incriminate him in future criminal proceedings."  United States v. Ramos, 685 F.3d 120, 126 (2d Cir. 2012).  It also allows a person to express his desire to remain silent, or to remain silent until he has the assistance of an attorney.  Cf. Wainwright v. Greenfield, 474 U.S. 284, 295 n.13 (1986) ("With respect to post-*Miranda* warnings 'silence,' we point out that silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted.").

In order for the privilege to be given full effect, individuals must not be forced to choose between making potentially incriminating statements and being penalized for refusing to make them.  Thus, in Griffin v. California, 380 U.S. 609, 613 (1965), the Supreme Court held that a prosecutor may not "tender[] to the jury for its consideration

9

the failure of the accused to testify" as substantive evidence of guilt. "[T]he Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Id. at 615; see also Baxter v. Palmigiano, 425 U.S. 308, 319 (1976) (noting that Griffin "prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt").

Neither we nor the Supreme Court has squarely addressed whether Griffin's holding should be extended to protect a defendant's pretrial, and more specifically prearrest, invocation of his Fifth Amendment privilege from prosecutorial comment as part of the government's case in chief. In Jenkins v. Anderson, 447 U.S. 231, 233-34 (1980), the Supreme Court considered the government's impeachment use of testimony concerning the defendant's failure to turn himself into police immediately after killing a man, which at trial he claimed to have done in self-defense. The Court held that "the Fifth Amendment is not violated when a defendant who testifies in his own defense is impeached with his prior silence." Id. at 235.[1] Jenkins's holding was premised on the

[1] By contrast, the Court held in Doyle v. Ohio, 426 U.S. 610, 611 (1976), that the government may not impeach a defendant's trial testimony "by cross-examining [him] about his failure to have told the [same] story [to investigators] after receiving *Miranda* warnings." The Court explained that, "while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Id. at 618. Okatan cites Doyle in support of his Fifth Amendment argument, but the case is inapposite. The parties agree that Okatan was not given Miranda warnings before telling Boucher that he wanted a

10

principle that a defendant who "takes the stand in his own behalf . . . does so as any other witness, . . . subject to cross-examination impeaching his credibility," even if that cross-examination relies on evidence that might otherwise be inadmissible under the Fifth Amendment. Id. at 235-36 (internal quotation marks omitted). The Jenkins Court therefore expressly left open the question of "whether or under what circumstances prearrest silence may be protected by the Fifth Amendment," id. at 236 n.2, and, in turn, the extent to which the government may rely on such silence when a defendant does not waive his Fifth Amendment rights by testifying at trial.

As the government here has observed, at the time this appeal was briefed and argued, the Federal Courts of Appeals were divided over whether a defendant's prearrest silence could be introduced as part of the government's case in chief without violating the Fifth Amendment protection against self-incrimination. Compare Combs v. Coyle, 205 F.3d 269, 286 (6th Cir. 2000) (where defendant "clearly invoked the privilege against self-incrimination . . . the prosecutor's comment on [his] prearrest silence in its case in chief and the trial court's instruction permitting the jury to use [the defendant's] silence as substantive evidence of guilt violated [his] Fifth Amendment rights"); United States v. Burson, 952 F.2d 1196, 1201 (10th Cir. 1991) ("[O]nce a defendant invokes his right to remain silent, it is impermissible for the prosecution to refer to any Fifth Amendment rights which defendant exercised."); Coppola v. Powell, 878 F.2d 1562, 1568 (1st Cir.

lawyer, and any constitutional violation in this case therefore arises from Okatan's right against self-incrimination rather than his right to due process.

11

1989) (the government's affirmative use of defendant's prearrest invocation of Fifth Amendment rights was unconstitutional); United States ex rel. Savory v. Lane, 832 F.2d 1011, 1015, 1017 (7th Cir. 1987) (introduction of officer's testimony that defendant said "he didn't want to make any statements" violated the Fifth Amendment); with United States v. Oplinger, 150 F.3d 1061, 1065-67 (9th Cir. 1998) (admission of testimony regarding defendant's reaction to prearrest questioning by his supervisors into potentially illegal activity did not violate the Fifth Amendment), overruled on other grounds by United States v. Contreras, 593 F.3d 1135 (9th Cir. 2010); United States v. Zanabria, 74 F.3d 590, 593 (5th Cir. 1996) (finding constitutional prosecutor's use of evidence that prior to arrest defendant did not indicate that he was under duress because "[t]he fifth amendment protects against compelled self-incrimination but does not . . . preclude the proper evidentiary use and prosecutorial comment about *every* communication or *lack* thereof by the defendant which may give rise to an incriminating inference") (emphasis in original); United States v. Rivera, 944 F.2d 1563, 1568 (11th Cir. 1991) ("The government may comment on a defendant's silence if it occurred prior to the time that he is arrested and given his *Miranda* warnings.").

In identifying this circuit split, the government did not distinguish between cases involving defendants who simply failed to speak prior to arrest and those involving defendants who affirmatively invoked their right to remain silent. It is a distinction we similarly elided in United States v. Caro, 637 F.2d 869, 876 (2d Cir. 1981), in which we expressed doubt that the Fifth Amendment "permits even evidence that a suspect

12

remained silent before he was arrested or taken into custody to be used in the

Government's case in chief." However, it is a distinction that has taken on new

importance in light of the Supreme Court's decision in Salinas v. Texas, 133 S. Ct. 2174

(2013), which was rendered after briefing and oral argument in this case were completed.

In Salinas, police officers investigating a shooting asked Salinas during the course

of a voluntary interview whether shells recovered at the crime scene would match shells

used by a gun to which he had access. Salinas, who until that moment had freely

answered the officers' questions, looked down, became tense, and stayed silent. After a

few moments, the officers resumed the interview, asking different questions, which

Salinas answered. Id. at 2178. Salinas was tried for the shooting. At trial, he did not

testify, and the government relied on his silence during the interview as evidence of his

guilt. The Court granted certiorari to address whether "the prosecution may use a

defendant's assertion of the privilege against self-incrimination during a noncustodial

police interview as part of its case in chief." Id. at 2179. However, a plurality of the

Court ultimately found it "unnecessary to reach that question," id., holding instead that

Salinas's "Fifth Amendment claim fail[ed] because he did not expressly invoke the

privilege against self-incrimination in response to the officer's question." Id. at 2178.

While the Supreme Court in Salinas did not decide the question presently before

us, it did clarify that the issue as we framed it in Caro – whether the government may use

a defendant's prearrest silence as substantive evidence of guilt – is properly analyzed in

two parts: first, whether the defendant's silence constituted an "assertion of the privilege

13

against self-incrimination," and second, if so, "whether the prosecution may use [that assertion] . . . as part of its case in chief," id. at 2179.

**II.    Application**

With respect to the first question, we conclude that Okatan successfully asserted the privilege when he told Boucher that he wanted a lawyer. First, we note that Okatan was entitled to invoke the privilege at that time. "[T]he right to remain silent exists independently of the fact of arrest." United States v. Nunez-Rios, 622 F.2d 1093, 1100 (2d Cir. 1980). "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." Hoffman v. United States, 341 U.S. 479, 486-87 (1951). Okatan's request for an attorney was made in the course of an interrogation by a border patrol agent. More specifically, Boucher had repeated a question, explicitly suggesting that Okatan's first answer to that question itself constituted a crime. Based on these circumstances, Okatan had "reasonable cause to apprehend danger from a direct answer," id. at 486, and reason to fear that any such answer "might be used to incriminate him in future criminal proceedings," Ramos, 685 F.3d at 126. See United States v. Rodriguez, 706 F.2d 31, 37 (2d Cir. 1983) (finding "clearly a sufficient basis to give rise to a legitimate claim of privilege" by a defense witness in a criminal trial where "it was not at

14

all unreasonable to assume that [the witness] perceived herself to be, and indeed was, still at risk in terms of facing a raft of both federal and state charges").

Second, unlike Salinas, who simply stopped talking during the course of an interrogation, Okatan affirmatively claimed the privilege before he fell silent. See Salinas, 133 S. Ct. at 2179 ("[A] witness who desires the protection of the privilege must claim it at the time he relies on it.") (internal quotation marks and ellipsis omitted). Okatan did not use the words "Fifth Amendment" or "privilege against self-incrimination," but such precision is not required. See Quinn v. United States, 349 U.S. 155, 164 (1955) ("[N]o ritualistic formula is necessary in order to invoke the privilege."). A defendant must only put an interrogating official "on notice [that he] intends to rely on the privilege." Salinas, 133 S. Ct. at 2179. In the context of custodial interrogation, "an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease." Fare v. Michael C., 442 U.S.707, 719 (1979). Similarly, even when an individual is not in custody, because of "the unique role the lawyer plays in the adversary system of criminal justice in this country," id., a request for a lawyer in response to law enforcement questioning suffices to put an officer on notice that the individual means to invoke the privilege.

We must therefore address the question the Supreme Court left unanswered in Salinas: "whether the prosecution may use a defendant's assertion of the privilege against

15

self-incrimination during a noncustodial police interview as part of its case in chief," Salinas, 133 S. Ct. at 2179. We hold that it may not.

A prosecutor may not comment on a defendant's failure to testify at trial. Griffin, 380 U.S. at 614. As the Supreme Court has explained, such comment would be "a penalty imposed by courts for exercising a constitutional privilege," which "cuts down on the privilege by making its assertion costly." Id. The same logic governs our decision today. Use of a defendant's invocation of the privilege imposes the same cost no matter the context in which that invocation is made. When Boucher, for the second time, asked Okatan why he was in the rest area, any answer Okatan gave "might [have been] used to incriminate him in future criminal proceedings," Ramos, 685 F.3d at 126, and a simple failure to answer might also have been used to incriminate him, see Salinas, 133 S. Ct. at 2184 ("Before petitioner could rely on the privilege against self-incrimination, he was required to invoke it."). The Fifth Amendment guaranteed Okatan a right to react to the question without incriminating himself, and he successfully invoked that right. As the First Circuit has observed, allowing a jury to infer guilt from a prearrest invocation of the privilege "ignores the teaching that the protection of the fifth amendment is not limited to those in custody or charged with a crime." Coppola, 878 F.2d at 1566.[2]

---

[2] Indeed, in its brief on appeal, the government itself paradoxically concedes, without further explanation, "that under the circumstances of this case, it was error for the prosecutor to comment on Okatan's invocation of his right to counsel in summation," even as it argues that admission of Boucher's testimony was not an "abuse [of] discretion." The government's position is self-contradictory. Evidence is admissible when it is relevant to support a legitimate inference; if evidence is properly admitted as

16

Accordingly, we conclude that where, as here, an individual is interrogated by an officer, even prior to arrest, his invocation of the privilege against self-incrimination and his subsequent silence cannot be used by the government in its case in chief as substantive evidence of guilt.[3]

---

relevant to proving guilt, it cannot be impermissible for the prosecutor to explain the relevance of the evidence to the jury. Conversely, if (as the government concedes) it is impermissible for the prosecutor to argue to the jury that Okatan's invocation of his rights is indicative of guilt, there is no other basis on which Boucher's testimony about that invocation is relevant and admissible. Because the Fifth Amendment does not tolerate use of a defendant's invocation of his right to remain silent in the government's case in chief, we see no basis for distinguishing between elicitation of Boucher's testimony and the government's reference to that testimony in closing. See Coppola, 878 F.2d at 1567 ("Although the statement at issue in this case came in through police testimony and not through a comment by the prosecution, it is nonetheless evidence that came before the jury through the efforts and design of the prosecution."). The degree of emphasis placed by the government on such testimony informs any harmless error analysis, but it does not determine whether a constitutional violation occurred.

[3] We note that no Circuit court has reached the opposite conclusion. As discussed above, prior to Salinas the Circuits were divided over whether the government could use a defendant's simple prearrest *silence* in its case in chief, but the government has not identified, and we have not found, a Circuit case in which use of a defendant's prearrest *invocation of the Fifth Amendment* and subsequent silence was found constitutional. The Salinas Court suggested there was a split of authority over the latter issue and cited United States v. Rivera, 944 F.2d 1563, 1568 (11th Cir. 1991), see Salinas, 133 S. Ct. at 2179, but the defendant in Rivera never invoked the Fifth Amendment. Rather, a customs agent testified that the defendant was "expressionless," was not visibly nervous and said nothing when the agent singled her out for questioning and began to search her suitcase. Rivera, 944 F.2d at 1567. The Eleventh Circuit held that "[t]he government may comment on a defendant's silence if it occurred prior to the time that he is arrested and given his *Miranda* warnings," id. at 1568, but said nothing about the constitutionality of commenting on a defendant's invocation of the Fifth Amendment. On the other hand, at least three other Circuits have specifically held that a defendant's invocation of rights cannot be used in the government's case in chief. See Combs, 205 F.3d at 286 (where defendant "clearly invoked the privilege against self-incrimination . . . the prosecutor's comment on [his] prearrest silence in its case in chief . . . violated [the] Fifth

17

**III. Harmless Error**

The government argues that even if Boucher's testimony should not have been admitted, the error was harmless. "In order to disregard an error of constitutional dimension, we must be convinced that the error was harmless beyond a reasonable doubt." United States v. Reifler, 446 F.3d 65, 87 (2d Cir. 2006). The harmfulness of an improperly admitted statement must be evaluated in the context of the trial as a whole and "depends upon a host of factors," Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986), including "the strength of the government's case, the degree to which the statement was material to a critical issue, the extent to which the statement was cumulative, and the degree to which the government emphasized the erroneously admitted evidence in its presentation of the case," Reifler, 446 F.3d at 87. "The strength of the prosecution's case is probably the single most critical factor in determining whether error was harmless." United States v. Castano, 999 F.2d 615, 618 (2d Cir. 1993).

The evidence of Okatan's guilt was purely circumstantial and far from overwhelming. Okatan did not bring Uysal into the United States, and the government offered no direct evidence of any arrangement for Okatan to meet Uysal after Uysal

Amendment"); Burson, 952 F.2d at 1201 ("[O]nce a defendant invokes his right to remain silent, it is impermissible for the prosecution to refer to any Fifth Amendment rights which defendant exercised."); Coppola, 878 F.2d at 1567, 1568 (where defendant's "statement invoked his privilege against self-incrimination," his "constitutional rights were violated by the use of his statement in the prosecutor's case in chief"). While Salinas might affect the viability of these cases to the extent they address the factual circumstances necessary to find an effective invocation of rights, it does not affect their viability with respect to the implications of an effective invocation.

crossed the border on his own. In closing, the prosecution argued that Okatan had not behaved as an innocent man would. It emphasized the incongruity of Okatan's claim to have abandoned Uysal in Canada with his refusal to abandon him at the Lewiston port of entry; Okatan's possession of Uysal's luggage when he entered the United States; Okatan's return to upstate New York after driving into Vermont; the distance of only ten miles between the locations of the two men's arrests; the oddity of Okatan's decision to drive past one rest area and make a U-turn into another; Okatan's avoidance of eye contact with Uysal when they saw each other at the border patrol station after having been arrested; and, significantly, Okatan's request for a lawyer, and his failure to continue answering questions despite his previous cooperativeness. While some of these actions give rise to legitimate suspicion, none of them, taken singly or together, is compelling evidence that Okatan conspired to bring Uysal into the United States after Uysal had been turned back at Lewiston.

As Okatan emphasizes, none of the prosecution witnesses was able to testify about what Okatan or Uysal did between their departure from the Lewiston port of entry into Canada and their respective entries into the United States, and the government submitted no evidence that the two men had any contact after Okatan entered the United States. Rather, the case was built primarily on Okatan's suspicious behavior, which, according to the government, emphatically included his request for a lawyer. This was therefore "a case in which the government sought . . . to claim some significance in the defendant's refusal to answer a particular question," United States v. Grubczak, 793 F.2d 458, 462 (2d

19

Cir. 1986), and "the government can[not] show beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," United States v. Casamento, 887 F.2d 1141, 1179 (2d Cir. 1989) (internal quotation marks omitted).

The government nonetheless claims that any error was cured by the district court's instruction to the jury that a defendant has the right to remain silent and that it should not draw a negative inference from the exercise of this right. However, the instruction to which the government refers addressed only the defendant's right not to testify at trial, and made no mention of a broader right to remain silent. The court told the jury:

> The defendant did not testify in this case. Under our Constitution, a defendant has no obligation to testify or to present any other evidence because it is the prosecution's burden to prove a defendant guilty beyond a reasonable doubt. . . . You may not attach any significance to the fact that the defendant did not testify. You may not draw any adverse inference against him because he did not take the witness stand.

A juror hearing this instruction likely would not have understood the statement that "[t]he defendant did not testify in this case" to encompass his refusal to answer Boucher's questions. Accordingly, the court's instructions to the jury did not obviate the harm suffered as a result of Boucher's improperly admitted testimony and the emphasis that the government placed on that testimony in its closing.

**CONCLUSION**

For the foregoing reasons, we VACATE the judgment of the district court and REMAND the case for further proceedings consistent with this opinion.

20