IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

STATE OF WASHINGTON,              )
                                  )     No. 31094-9-III
            Respondent,           )
                                  )
      v.                          )
                                  )     OPINION PUBLISHED
EDWARD W. TERRY,                  )     IN PART
                                  )
            Appellant.            )

SIDDOWAY, C.J. — During Edward Terry's criminal trial for theft of a vehicle and
related charges, the trial court invited jurors to propose questions. One juror question
accepted by the trial court and posed to the deputy who arrested Mr. Terry was whether
Mr. Terry ever questioned or expressed surprise at being arrested. The deputy answered
that Mr. Terry did not ask, and in closing argument, the prosecutor reminded the jurors of
that answer and argued that Mr. Terry did not ask because "[he] knew that he had stolen a
vehicle and he was going to get caught." Report of Proceedings (RP) at 329. Mr. Terry's
lawyer did not object to the juror's question on constitutional grounds nor object to the
prosecutor's argument. For the first time on appeal, Mr. Terry argues that the testimony
and argument violated constitutional protections against self-incrimination and his right
to due process.

An error of manifest constitutional proportions occurred here, including as a result of the court-posed question. The error was not harmless as to most of the counts charged. It requires a new trial on all of the challenged convictions other than his conviction for resisting arrest.[1]

Given that disposition, we do not reach Mr. Terry's remaining assignments of error other than his request that we order all of the charges against him dismissed on the basis of allegedly insufficient evidence. The evidence against him was sufficient. We reverse the convictions of theft of a vehicle, possession of a stolen vehicle, and trespassing, and remand for a new trial on those counts.

## FACTS AND PROCEDURAL BACKGROUND

Edward Terry was arrested after he was followed from the scene of a one-car accident on a county road near Dayton. The accident was witnessed by Angelia and Gordon Smith, who were standing outside at around 7 a.m. when they saw an approaching truck round a corner at a high rate of speed, spin out on gravel, hit the bank on the side of the road, and flip over. The driver crawled from under the truck and ran through a wheat field up a nearby hill, away from the crash site. Mr. Smith saw the

---

[1] Mr. Terry's judgment and sentence included his conviction of an assault committed in March 2012 that he does not challenge.

individual "turn[ ] around in kind of a swinging motion, looked like he threw something." RP at 172.

Ms. Smith immediately called her OnStar service, which conveyed her report of the accident to 911. Although she and her husband were as much as a quarter of a mile away from where the truck flipped over, they described the driver to the OnStar representative who answered their call as between 5 feet 6 inches and 6 feet tall, wearing dark clothing, with long dark hair, wearing a hoodie or a cap, and jeans.

Columbia County Deputy Sheriff Richard Loyd responded to the report of the accident and spoke to Mr. Smith, who had walked to the truck to make sure no one else was inside. Mr. Smith told Deputy Loyd which direction the driver had run. He also explained that the farm on which they were standing was his, that he was familiar with the terrain over the hill, and that he thought they could probably catch up with the driver. The deputy took Mr. Smith up on his offer of help and the two went looking for the driver in the deputy's sports utility vehicle.

Two miles from the crash site, Mr. Smith and Deputy Loyd saw Mr. Terry walking slowly. Deputy Loyd knew Mr. Terry from prior contacts. Mr. Terry is 6 feet 2 inches tall and at the time had very short hair.

The deputy approached Mr. Terry and ordered him to stop and get on the ground. Mr. Terry refused and made a contemptuous finger gesture at Mr. Smith and the deputy. Deputy Loyd then approached Mr. Terry with his gun drawn. When he was close enough

3

to satisfy himself that Mr. Terry was not armed, the deputy put away his sidearm and drew his taser, again telling Mr. Terry to get on the ground and put his hands behind his back or he would be "tased." RP at 228. In what testimony suggests was a sardonic tone, Mr. Terry responded, "'Oh, a taser'" and renewed the finger gesture, although this time using both hands. *Id.* He then turned his back on the deputy and Mr. Smith, dropped his pants, and, as Mr. Smith would later testify, "mooned both of us." RP at 179. That done, he pulled up his pants, dropped to the ground, and put his hands behind his back.

The deputy attempted to handcuff Mr. Terry, telling him to turn his head away; he later explained to the jury that when handcuffing an individual who is prone, officers prefer to be out of the individual's line of sight. Mr. Terry did not comply, answering, according to the deputy, "that was all I was going to get." RP at 229. The officer then walked around to Mr. Terry's other side. He placed a handcuff on Mr. Terry's left wrist but, when he reached for his right arm to cuff his second wrist, Mr. Terry tried to push up against the deputy, roll over, and bite him. Deputy Loyd told Mr. Terry he was resisting arrest, which Mr. Terry denied. Deputy Loyd then used a pressure compliance technique and Mr. Terry relented and allowed him to finish handcuffing him. The deputy would later testify that the basis for the arrest was trespass.

Deputy Loyd took Mr. Terry to the sheriff's department. During the booking process, Ralph Frame, who owned the truck in which Mr. Terry had been driving, called the department to report that his truck had been stolen. He had left it parked in front of

4

his shop the night before with the keys inside, and in the morning it was gone. It turned out that Mr. Frame's shop was a quarter mile from where Mr. Terry lived with his mother and was 10 to 12 miles from the crash site.

After booking Mr. Terry and traveling to speak to Mr. Frame, Deputy Loyd returned to the scene of the crash to further investigate. He was unable to find the keys to the truck either in the truck or in the area of the field where Mr. Smith thought he had seen Mr. Terry swing his arm as if to throw something. He saw footsteps leaving the crash site and going up into the field. Hoping to better tie Mr. Terry to the stolen truck, the deputy attempted to follow the path of the footprints through wheat fields, a pea field, and an access road that lay between where the truck rolled and where he arrested Mr. Terry. Using a GPS (global positioning system) device, he tracked his steps, later producing a topographical map that showed where he had been able to follow the footprints and where, on several occasions, he lost them. He took pictures of the tracks and later obtained pictures of Mr. Terry's shoe tread, taken at the jail.

Mr. Terry was eventually charged with theft of a vehicle, possession of a stolen vehicle, trespassing, and resisting arrest.

At trial, Mr. Smith and Deputy Loyd testified that when Mr. Terry was encountered and arrested, Mr. Smith had identified him as the individual he had seen climbing out of the truck. Although Mr. Terry proved taller than Mr. Smith initially believed and Mr. Smith's description of his hair and clothing did not prove accurate, Mr.

5

Smith expressed confidence in his identification from the fact that it was early in the morning and he and his wife had seen no one else around. He testified that from his and Deputy Loyd's first sighting of Mr. Terry he felt sure from his appearance and location that he was the individual who crawled out of the truck and ran up the hill. He admitted that he had been too far away to see facial features and that he could not positively identify Mr. Terry at the time of trial.

Deputy Loyd described the map he had created tracking footsteps from the crash site to where he and Mr. Smith encountered Mr. Terry and testified that the tracks made through the field were made by the shoes worn by Mr. Terry at the time of his arrest.

The trial court allowed jurors to propose questions during the trial. When given the opportunity to propose questions after Deputy Loyd's testimony, a juror wrote, "'Did he, Eddie Terry, ever ask or wonder why he was arrested? Was he surprised he was arrested?'" RP at 292. Mr. Terry's counsel objected on hearsay grounds and that the question called for speculation by the deputy. The court overruled the objections and posed the questions. The deputy answered "No" when asked if Mr. Terry asked or wondered why he was arrested. RP at 294. In response to the question about whether Mr. Terry was surprised, the deputy said, "I don't know if he was surprised or not." *Id.*

During closing argument, the prosecutor referred to the juror's question and Deputy Loyd's response:

One more item I want to talk about in regards to resisting arrest, and actually applicable, ah, to all the charges here is: when Deputy Loyd was asked, did the defendant ask why he was being arrested? No. He knew. He knew that he had stolen a vehicle and he was going to get caught. He knew that he possessed that vehicle and wrecked it. He knew that he trespassed. That's why he didn't ask the question.

RP at 329.

The jury found Mr. Terry guilty as charged. He appeals.

ANALYSIS

*I. Unconstitutional use of Mr. Terry's postarrest silence*

Mr. Terry contends that his rights under the United States and Washington Constitutions were violated, first, when the trial court posed a juror's questions to Deputy Loyd that invited a response from the deputy that Mr. Terry never asked why he was being arrested, and second, when the prosecutor then argued in closing that Mr. Terry's failure to ask about his arrest was probative of guilt. Mr. Terry argues that both were impermissible comments on his postarrest silence, in violation of constitutional protections against self-incrimination and requirements of due process.

The State argues that "[a] reasonable interpretation is that the juror question applies to the *pre-arrest* time period when Mr. Terry was first being approached by Deputy Loyd," so that only constitutional protections against compelled testimony are implicated, not the right to due process. Br. of Resp't at 24 (emphasis added). Whether the testimony and argument were a comment on *prearrest* rather than *postarrest* silence

can make a difference after the United States Supreme Court's decision in *Salinas v. Texas*, __ U.S. __, 133 S. Ct. 2174, 186 L. Ed. 2d 376 (2013).

In *Salinas*, a three-member plurality of the Supreme Court held that if an individual voluntarily submits to an interview by police and reaches a point at which he or she chooses not to speak based on Fifth Amendment rights,[2] he or she must affirmatively invoke those rights. Otherwise, the State may offer and the jury may consider the fact that a defendant failed or refused to speak to law enforcement in circumstances where an innocent person would reasonably be expected to speak. As explained by the Court, "[P]opular misconceptions notwithstanding, the Fifth Amendment guarantees that no one may be 'compelled in any criminal case to be a witness against himself'; it does not establish an unqualified 'right to remain silent.'" 133 S. Ct. at 2182-83.

The petitioner in *Salinas* agreed to speak to officers investigating a murder, but balked when the officer asked whether a ballistics test would tie shell casings found at the crime scene to the petitioner's shotgun. At trial, the officer was permitted to testify to the petitioner's suspicious silence in response to that question and the prosecutor was permitted to argue that the petitioner's reaction suggested guilt. The plurality decision in

---

[2] Made applicable to the states through the Fourteenth Amendment as recognized in *Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964).

*Salinas* held that the testimony and argument was unobjectionable because the petitioner was speaking to the investigating officer voluntarily and "it would have been a simple matter for him to say that he was not answering the officer's question on Fifth Amendment grounds. Because he failed to do so, the prosecution's use of his noncustodial silence did not violate the Fifth Amendment." *Id.* at 2180.[3] Since "'no ritualistic formula is necessary in order to invoke the privilege [against self-incrimination],'" *id.* at 2178 (quoting *Quinn v. United States*, 349 U.S. 155, 164, 75 S. Ct. 668, 99 L. Ed. 964 (1955)), courts faced with the admissibility of *prearrest* silence after *Salinas* have examined the defendant's conduct to see if an invocation of Fifth Amendment rights was either express or implied. *See, e.g., United States v. Okatan*, 728 F.3d 111 (2d Cir. 2013) (while defendant did not say "Fifth Amendment" or "privilege against self-incrimination," his expression of a desire to speak with a lawyer sufficed to invoke the privilege).

---

[3] Two justices (Thomas, J., and Scalia, J.) expressed their disagreement with *any* limitation on the State's right to comment on a defendant's silence or failure to testify. They characterized *Griffin v. California*, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965), which held that the Fifth Amendment prohibits a prosecutor or judge from commenting on a defendant's failure to testify, as "'lack[ing] foundation in the Constitution's text, history, or logic'" and establishing a principle that "should not be extended." *Salinas*, 133 S. Ct. at 2184 (Thomas, J., concurring in judgment) (quoting *Mitchell v. United States*, 526 U.S. 314, 341, 119 S. Ct. 1307, 143 L. Ed. 2d 424 (1999) (Thomas, J., dissenting)).

The Washington Constitution includes its own provision against self-incrimination but it provides no greater protection; the Washington Supreme Court has held that it "'envisions the same guarantee as that provided in the federal constitution.'" *State v. Mecca Twin Theater & Film Exch., Inc.*, 82 Wn.2d 87, 91, 507 P.2d 1165 (1973) (quoting *State v. Moore*, 79 Wn.2d 51, 57, 483 P.2d 630 (1971)); *In re Pers. Restraint of Ecklund*, 139 Wn.2d 166, 172 n.6, 985 P.2d 342 (1999) (the federal and state constitutional provisions "are given the same interpretation").

Commenting on postarrest silence raises a second constitutional concern, grounded in due process. Warnings under *Miranda*[4] given upon arrest "constitute an 'implicit assurance' to the defendant that silence in the face of the State's accusations carries no penalty," making it fundamentally unfair to then penalize the defendant by offering his silence as evidence of guilt. *State v. Easter*, 130 Wn.2d 228, 236, 922 P.2d 1285 (1996) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993); *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976)). For the government to comment on post-*Miranda* silence is to "[break] its promises given in the *Miranda* warnings and violate[ ] due process of law." *State v. Burke*, 163 Wn.2d 204, 213, 181 P.3d 1 (2008).

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

The State recognizes that controlling case law is more protective of a defendant's postarrest silence when it argues that we should regard the juror's question as addressed to the prearrest time period. But its argument that the juror was interested in prearrest events is grounded more in hope than in reality. The juror's questions, as handwritten by the juror and read by court, asked if Mr. Terry ever "ask[ed] or wonder[ed] why he *was arrested*" or was "surprised that he *was arrested.*" Clerk's Papers at 120 (emphasis added); RP at 292. The questions followed Deputy Loyd's testimony that he ordered Mr. Terry to stop and drop immediately upon encountering him, drew his gun when Mr. Terry did not comply, undertook to handcuff him, and then read Mr. Terry his *Miranda* rights, in response to which Mr. Terry said he understood his rights. The deputy also testified that Mr. Terry "immediately told me he didn't want to talk to me," although that answer was stricken upon objection. RP at 231. In short, the jury had not heard testimony about any meaningful prearrest period to which the juror's questions could have been directed. We are dealing, then, with testimony and argument involving postarrest silence.

The State next argues that because Mr. Terry failed to object to the juror's question on constitutional grounds and did not object at all to the prosecutor's argument, he may not raise the due process issue for the first time on appeal. Ordinarily, we will not review an error to which no objection was made in the trial court. RAP 2.5(a). This includes error involving an improper reference to a defendant's postarrest silence; an

11

exception exists, however, for "manifest error affecting a constitutional right." RAP 2.5(a)(3); *Burke*, 163 Wn.2d at 224 (Madsen, J., dissenting).

The Washington Supreme Court has distinguished between "comments" and "references" to a criminal defendant's silence, recognizing that "[b]oth are improper, but only the former rise to the level of constitutional error," and that what are merely improper references "are not reviewable for the first time on appeal." *Burke*, 163 Wn.2d at 225 (citing *State v. Romero*, 113 Wn. App. 779, 790-91, 54 P.3d 1255 (2002)). The distinction "focus[es] largely on the purpose of the remarks." *Id.* at 216 & n.7 (collecting examples). A "comment" occurs when the State uses a defendant's silence as substantive evidence of guilt or suggests the silence was an admission of guilt. *State v. Gregory*, 158 Wn.2d 759, 838, 147 P.2d 1201 (2006) (quoting *State v. Lewis*, 130 Wn.2d 700, 707, 927 P.2d 235 (1996)).

In *Romero*, this court suggested a two-part analytical framework for determining whether a State agent's direct or indirect comments during trial on a defendant's silence amount to constitutional error. The first step asks whether the comment was "direct," in the sense examined in *Lewis*, which is to ask whether the witness effectively stated or expressed an opinion that the defendant's silence was evidence of guilt. *See Lewis*, 130 Wn.2d at 706. A direct comment is automatic constitutional error.

If the comment was not direct, *Romero* suggested three questions, drawn from earlier Washington cases, from which to determine whether the State was seeking to capitalize on an *inference* of guilt in a manner violating the defendant's rights:

> First, could the comment reasonably be considered purposeful, meaning responsive to the State's questioning, with even slight inferable prejudice to the defendant's claim of silence? Second, could the comment reasonably be considered unresponsive to a question posed by either examiner, but in the context of the defense, the volunteered comment can reasonably be considered as either (a) given for the purpose of attempting to prejudice the defense, or (b) resulting in the unintended effect of likely prejudice to the defense? Third, was the indirect comment exploited by the State during the course of the trial, including argument, in an apparent attempt to prejudice the defense offered by the defendant?

*Romero*, 113 Wn. App. at 790-91 (citations omitted). Answering "yes" to any of the questions means the indirect comment is an error of constitutional proportions. *Id.* at 791.

The second question suggested by *Romero* must be answered "no" here because Deputy Loyd's answer was directly responsive to the court's question; he volunteered nothing more. A necessary variant of the first question and the third question must both be answered "yes," however.

The State argues that the first question must be answered "no" because it did not pose the question about silence—the court did. As a result, it argues, constitutional error was avoided. We disagree. *Romero* did not consider the possibility of testimony that is responsive to a juror- or court-posed question that invites a prejudicial inference or

implication of guilt. The fact that the question was posed by the court makes it uniquely problematic and requires that the first question be modified in the circumstances present here.

Before Mr. Terry's trial, the State agreed to invite jurors to ask questions. It is a practice that is standard and acceptable in civil trials, *see* CR 43(k), but that is discouraged in criminal trials because of the risks of harm it presents. A comment to former Washington Pattern Jury Instruction (Criminal) 4.66, which was to be given when jurors posed questions in criminal trials, stated that the instruction should not be given unless a juror expressed a desire to question a witness and that it was "'advisable that a judge should not encourage jurors to ask questions.'" *State v. Monroe*, 65 Wn. App. 245, 251, 828 P.2d 24 (1992) (quoting 11 WASHINGTON PRACTICE: PATTERN JURY INSTRUCTIONS: CRIMINAL 4.66 cmt. (1977) (WPIC)). The *Monroe* court agreed with authors of the pattern instructions in discouraging the practice, stating that "we believe the active solicitation of juror questions is inappropriate." *Id.* at 254. *State v. Munoz*, 67 Wn. App. 533, 538, 837 P.2d 636 (1992) reiterated disapproval of actively soliciting juror questions, recognizing that "[p]otentially serious problems could arise from juror questions." Following *Monroe* and *Munoz*, the authors of the Washington pattern instructions withdrew WPIC 4.66 (1977). The comments to the withdrawn instruction state that "[g]iven the concerns expressed by the Court of Appeals, the committee

recommends trial courts not raise the issue unless a juror inquires." 11 WASHINGTON

PRACTICE: PATTERN JURY INSTRUCTIONS: CRIMINAL 4.66, at 130-31 (3d ed. 2008).

Having nonetheless exercised its discretion to invite juror questions in Mr. Terry's

trial, the trial court read an instruction that described for jurors how and when they could

write out and submit their questions. It included the following explanation, modified

from WPIC 4.66 (1977):

> *I will review the question*—actually, I have to, ah, excuse you across
> the hall, then I review the questions with the lawyers outside your presence,
> ah, *to make sure they're . . . in allowable form and don't violate some
> technical rule of evidence, and I'll review it to make sure it's legally
> proper.* There are some questions I won't ask. . . . It will often be the case
> that a lawyer has not asked a question because it's legally objectionable or
> because a later witness may be addressing that subject.

RP at 151-52 (emphasis added). Given the highlighted language, the instruction

implicitly communicated to the jurors that any question the judge accepted and posed

would be "in allowable form," would not violate any technical rule of evidence, and

would be "legally proper."

It is reasonable to assume that the juror who asked whether Mr. Terry wondered

why he was being arrested thought it was a good question, since if Mr. Terry was

unsurprised it would tend to prove guilt. When the question was accepted by the court

and posed to Deputy Loyd, it received institutional imprimatur in the eyes of the jurors.

A leading treatise has recognized that among the risks of permitting jury questions is that

"the jurors will attach inordinate weight to the witnesses' answers to the jurors' questions

15

and slight the testimony elicited by the parties." 1 MCCORMICK ON EVIDENCE § 8 (Kenneth S. Broun ed., 7th ed. 2013). Whether we view the State as one of the gatekeepers of jury questions posed in a criminal trial or analyze this as a problem of independent trial court error, the outcome is the same. *Cf. Griffin v. California*, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965) (treating the trial court's instructions on permissible inferences from silence and the State's argument as equally problematic). We conclude that where a juror-proposed, court-posed question in a criminal trial invites a comment on a defendant's silence, a fourth question must be added to the second step of the *Romero* analysis: has the State *acquiesced* in a question by the trial court that results in a responsive comment that even slightly and prejudicially infers or implies guilt from a defendant's silence? If the answer is yes, as it is here, then an issue of constitutional error is raised that must survive constitutional error review.

The answer to the third *Romero* question provides further support for the manifest constitutional character of the error in this case. The State not only acquiesced in a question that elicited testimony prejudicially inferring or implying guilt, it then highlighted that inference or implication and encouraged the jury to rely upon it. It cannot be seriously contended that the prosecutor's closing argument was merely a passing reference that was not relied upon by the State as evidence of guilt. The State's exploitation of Deputy Loyd's indirect comment on Mr. Terry's silence presents further constitutional error.

16

The question that remains is whether the error was harmless. A constitutional error is harmless only if the reviewing court is convinced beyond a reasonable doubt that any reasonable jury would reach the same result absent the error and where the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt. *Burke*, 163 Wn.2d at 222; *State v. Emery*, 174 Wn.2d 741, 757, 278 P.3d 653 (2012) (constitutional harmless error standard applies to direct constitutional claims involving prosecutors' improper arguments).

As to the three crimes that are alleged to have preceded the deputy's encountering Mr. Terry, the comments were not harmless. Mr. Smith lost sight of the driver of the truck after he crested the first hill, and his and his wife's initial description of the driver did not match Mr. Terry. Deputy Loyd did not testify to any forensic training or expertise in matching footprints to a particular shoe and he admitted he was unable to locate an unbroken footprint trail between the crash site and the location where he and Mr. Smith encountered Mr. Terry. The evidence was not sufficiently overwhelming to necessarily lead to a finding of guilt and there is a real risk that the jury attached special significance to the response to, and argument from, the juror's question.

As to the resisting arrest charge, however, the error was harmless. Deputy Loyd's and Mr. Smith's testimony as to what transpired during the course of the arrest was consistent and undisputed and included both men's testimony that the deputy accused Mr. Terry of resisting during the course of the arrest. Mr. Smith testified first, telling the jury

17

that "the Officer said, 'You're resisting arrest.' [Mr. Terry] said, 'No, I'm not.' At one time I saw him try and bite the Officer, so I kind of figured that was resisting in my mind." RP at 179. The deputy's recollection was that he told Mr. Terry "to stop resisting." RP at 230. Given Mr. Smith's testimony that Mr. Terry was aware of the perception that he was resisting arrest and denied it, the State's comments do not present the same problem with respect to the resisting arrest charge. There was no question of Mr. Terry's identity with respect to that charge, either; the testimony was undisputed and overwhelming.

We affirm the conviction of resisting arrest. We reverse the convictions of theft of a vehicle, possession of a stolen vehicle, and trespassing, and remand for a new trial on those counts. In light of that disposition, we need not reach Mr. Terry's remaining assignments of error, which address matters that might not arise in a new trial or, if they do, will involve a different record.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions. RCW 2.06.040.

## II. Sufficiency of the evidence

Mr. Terry requests more than a new trial, however; he argues that insufficient evidence was presented at trial to support his convictions of all but the charge of resisting

18

arrest. He asks that we remand with directions to dismiss those charges. He makes two principal arguments.

His first—which, if successful, would be fatal to all three of the challenged claims (theft, possession of a stolen vehicle, and trespass)—is that there was insufficient evidence that he was the individual seen crawling out of Mr. Frame's truck by the Smiths.

His second pertains only to the charge of possessing a stolen vehicle; he argues that even if there is sufficient evidence that he was in possession of a stolen vehicle, the evidence was insufficient to establish his knowledge that it was stolen.

An insufficient evidence claim admits the truth of the evidence as well as all reasonable inferences that can be drawn from the evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). On appeal, we will defer to the trial court regarding issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). A conviction will be reversed only when no rational trier of fact could have found that the State proved all of the elements of the crime beyond a reasonable doubt. *State v. Smith*, 155 Wn.2d 496, 501, 120 P.3d 559 (2005).

19

A.      The identification of Mr. Terry as having been in
possession of Mr. Frame's truck near the Smiths' farm

The only witnesses who saw the individual crawl out of the stolen truck following the accident were Angelia and Gordon Smith. Being able to place Mr. Terry in the truck was essential not only to the theft and possession of stolen property charges but also to the trespassing charge, since Mr. Terry was not on the Smiths' land when he was arrested.

Immediately after seeing Mr. Frame's truck skid and roll, Ms. Smith got into her own truck and used its OnStar service to report the accident. While speaking with the OnStar representative, she saw the driver crawling out of the truck. She testified at trial:

> And the next thing, I look up and I see this guy in our wheat field and he is
> hoofing it. I don't think I've ever seen anybody run that fast in my life. He
> was like a gazelle going up this hill. And trust me, I have Arabian horses
> and we go up these hills on these horses and they're ready to stop when
> they get to the top.

RP at 162. Asked at trial to describe the man that she saw, she testified, "He was tall and slender, wearing a hoodie or a cap or something, jeans, ah—like I said, I was a little bit away, so I didn't—I got a good look that he was tall and slender and man can he run." *Id.* She testified that his age was "hard to gauge. He wasn't too old. He definitely wasn't my age. Ah, but I'd have to guess—he didn't look like a teenager, you know." *Id.*

When asked to describe the person he saw, Mr. Smith testified:

20

[I]t was, ah, a male individual, appeared to be Caucasian, five and a half to six feet tall, slender build, wearing dark clothing. Couldn't wear—tell if it was really black hair or dark hair or wearing some kind of a hat. Ah, and literally, ah, climbed out of the vehicle as I said before, and then immediately started running perpendicular up the hill, which is a very steep hill. These are Palouse hills—it's farming country. Ah, and he was going at a high rate of speed, and I just was totally amazed. And that's really the only visual I got at that point.

RP at 173. Mr. Smith was later asked whether the description he had provided to OnStar matched Mr. Terry's appearance when he and the deputy tracked him and encountered him in the field, and testified:

A.  Ah, pretty accurate. Actually, ah, he was a little taller than I thought, and, ah, was a slender male individual, and, ah, pretty much what—what I conveyed to OnStar.
Q.  Did you note anything about his clothing?
A.  Ah, other than it was, ah, jean jacket, dark shoes—I mean, dark pants, ah, shoes—boots, ah, not really.
Q.  Was that what you conveyed to OnStar as far as clothing; was that consistent with the—
A.  —Yes—
Q.  —person that you saw in the field?

RP at 178.

Compensating to some extent for the Smiths' distance from the scene of the accident and their inability to get a better look at the driver was Mr. Smith's familiarity with his land and surrounding areas and his confidence, reasonably explained, that he and the deputy would be able to track the driver. Mr. Smith's ability to anticipate the route the driver would follow, the timeliness of the pursuit, and the early hour and absence of anyone else seen in the vicinity were all facts that the jury was entitled to consider.

21

In addition to Mr. and Ms. Smith's testimony, the State offered evidence of Deputy Loyd's work in locating the path followed by the driver after the fact. There was no question that Mr. Terry was the individual encountered and arrested in a wheat farm two miles from the accident scene. The deputy's testimony that he was able to find a broken trail of footprints matching Mr. Terry's shoe from the location of the arrest back to the truck, if believed by the jury, tended to prove that Mr. Terry had been the driver of the truck.

Finally, the State presented evidence that Mr. Terry lived within a quarter mile of where Mr. Frame's truck had been stolen and was encountered 10 to 12 miles down the road from his home, early in the morning, and within a couple of miles of where someone had crashed the truck and taken off on foot.

While neither of the Smiths was able to make a positive identification of Mr. Terry at trial, the evidence that the State did present was collectively sufficient to persuade a rational trier of fact that it was Mr. Terry who was driving the truck at the time that it crashed.

      B.    Additional evidence required to prove theft and
                    possession of stolen property

Mr. Terry's remaining challenge to the sufficiency of the evidence is that even if the State presented evidence that he was driving the truck when it rolled, his mere possession of the truck at that time is not evidence that he stole it or knew it was stolen.

As he points out, Deputy Loyd conceded there are several reasons individuals may leave the scene of an accident, testifying, "'Usually when people flee the scene of a collision, there's something else going on—maybe they're intoxicated, don't have insurance, have warrants for their arrest, a myriad of things.'" Br. of Appellant at 15 (quoting RP at 226). Mr. Terry points out that since he invoked his *Miranda* rights immediately after being cuffed and read the rights, and because he chose not to testify at trial, the fact that he did not offer his own innocent explanation could not be used against him. *See State v. Mace*, 97 Wn.2d 840, 650 P.2d 217 (1982) (conviction vacated where the prosecutor impermissibly relied on defendant's postarrest silence as evidence defendant had no explanation for possessing stolen property).

Finally, he points out that even the trial court characterized the State's evidence supporting the theft charge as tenuous.[5]

---

[5] When Mr. Terry moved to dismiss all of the State's charges at the conclusion of the evidence, the trial court said:

> Looking at the evidence most favorably in light of the non-moving party, the State in this instance, ah, given the fact that the, ah—it's undisputed that the vehicle was still at its usual, ah, location of parking, ah, at the Frame residence, ah, the evening before—8:30, 9 o'clock before, and was gone by, ah—ah, 7 o'clock the next morning it was discovered missing, ah, by Mr. Frame. Ah, I realize that is tenuous, but it is a sufficiently short length of time, ah, upon which a jury could reasonably infer that it was Mr. Terry, ah, who took the vehicle, ah, and—and so, without the owner's permission. And—and—and that was the closest case you have as far as insufficient evidence.

RP at 297.

23

RCW 9A.56.140(1) defines possession of stolen property in part as "knowingly" receiving, retaining, possessing, concealing, or disposing of stolen property "knowing that it has been stolen." An individual's possession of *recently stolen* property increases the likelihood that the possessor has guilty knowledge but is insufficient, standing alone, to prove he or she knew the property was stolen. *State v. Couet*, 71 Wn.2d 773, 775, 430 P.2d 974 (1967). Possession of recently stolen property coupled with slight corroborative evidence is sufficient to prove guilty knowledge, however. *State v. Womble*, 93 Wn. App. 599, 604, 969 P.2d 1097 (1999). Corroborative evidence can include damage consistent with theft, such as a broken ignition; fleeing when stopped; and the absence of a plausible explanation for legitimate possession. *State v. L.A.*, 82 Wn. App. 275, 276, 918 P.2d 173 (1996); *Womble*, 93 Wn. App. at 604.

Anticipating that the State will point to Mr. Terry's flight, he argues that cases relying on flight as corroborating evidence sufficient to prove guilty knowledge deal with flight from a law enforcement officer, which he argues was not the case here. *See L.A.*, 82 Wn. App. at 276; *State v. Hudson*, 56 Wn. App. 490, 784 P.2d 533 (1990). Yet proof that a driver fled a stolen car after an accident has a tendency to make it more probable that the driver was aware the car was stolen regardless of whether a law enforcement officer was present. *Cf.* ER 401 (defining relevant evidence). His flight was relevant evidence.

24

Additional corroborative evidence exists in the fact that Mr. Terry was living with his mother within a quarter mile of where Mr. Frame's truck was parked with the keys inside. His mother also testified that on the night of the theft she got up several times to use the bathroom and noticed that her son was not sleeping on the sofa; she testified that she thought he was sleeping in a trailer outside but an inference could be drawn from her testimony that the sofa was where he usually slept.

Mr. Terry attacks the proximity of his mother's home and Mr. Frame's shop as corroborative because Dayton is a small town and its environs are rural, with "everyone liv[ing] close to everyone else." Br. of Appellant at 14 n.1. It is corroborative, however, because the fact that Mr. Terry lived close to where the truck was left unlocked with the keys inside has a tendency to make it more likely that Mr. Terry was the thief than if nothing placed Mr. Terry within the vicinity of the unlocked truck.

The proximity of Mr. Terry's residence to the stolen truck, his mother's testimony that she did not see him the night of the theft, and his flight from the accident scene are sufficient corroboration, when added to evidence of the short time frame between the theft of the truck and Mr. Terry's possession of it, to support the jury's verdict that he was guilty of theft.

We affirm the conviction of resisting arrest. We reverse the convictions of theft of a vehicle, possession of a stolen vehicle, and trespassing, and remand for a new trial on those counts. In light of that disposition, we need not reach Mr. Terry's remaining

25

No. 31094-9-III
*State v. Terry*

assignments of error, which address matters that might not arise in a new trial or, if they do, will involve a different record.

_____
Siddoway, C.J.

WE CONCUR:

_____
Fearing, J.

_____
Antosz, J.P.T.

26